UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH DIAZ,

                              Petitioner,

              -against-

SUPERINTENDENT EARL BELL,

                              Respondent.

18cv10121 (AT) (DF)

**REPORT AND
RECOMMENDATION**

**TO THE HONORABLE ANALISA TORRES, U.S.D.J.:**

Petitioner Joseph Diaz ("Petitioner"), who, according to publicly available records, is currently incarcerated at Green Haven Correctional Facility in Beekman, New York ("Green Haven"),[1] filed a petition pursuant to 28 U.S.C. § 2254 seeking a writ of habeas corpus (the "Petition") on the grounds that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment when it permitted the prosecution to introduce a crime scene report, diagrams, and photographs without producing for cross examination the witness who prepared those documents.  Respondent Earl Bell, Superintendent of the Clinton Correctional Facility,[2] acting through the Bronx County District Attorney's Office, opposes the Petition on the grounds that the introduction of the above-described documents through the testimony of a substitute

---

[1] *See* New York State Department of Corrections and Community Supervision, *Inmate Information*, http://nysdoccslookup.doccs.ny.gov/ (accessed Apr. 10, 2022).

[2] At the time Petitioner filed his Habeas Petition, he was incarcerated at the Clinton Correctional Facility.  (*See* Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus By A Person In State Custody, dated Oct. 23, 2018 ("Pet.") (Dkt. 1).)  Now, because he is incarcerated at Green Haven, the current superintendent of Green Haven should be substituted as the proper respondent.

witness did not violate Petitioner's Confrontation Clause rights, and that, in any event, Petitioner

is not entitled to habeas relief under the applicable standard of review.

For the reasons set forth below, I recommend that the Petition be GRANTED.

## BACKGROUND

A.     **Factual Background**[3]

The facts summarized herein are taken from the evidence at Petitioner's trial, which was

conducted in October 2014 before Justice Newman, in the New York Supreme Court, Bronx

County.  The crimes with which Petitioner was charged all related to a 2009 shooting, in which

multiple people were involved (with some witnesses later calling the event a "shootout"), and in

which one individual (Aisha Santiago ("Santiago")) was killed.  Petitioner was accused by the

prosecution of having been the shooter who caused Santiago's death, and he was tried by a jury

on five counts:  second-degree intentional murder (N.Y. Penal Law § 125.25(1)); second-degree

depraved indifference murder (N.Y. Penal Law § 125.25(2)); first-degree intentional

manslaughter (N.Y. Penal Law § 125.20(1)); second-degree reckless manslaughter (N.Y. Penal

Law § 125.15(1)); and second-degree criminal possession of a weapon (N.Y. Penal Law

§ 265.03).  (*See* Appendix: 28 U.S.C. § 2254 Petition ("App'x"), at A31.)[4]

---

[3] The transcripts of the state court proceedings in this case have been submitted by
Respondent and are included in Dkt. 13.  Petitioner's pretrial proceedings, trial, and sentencing
were all conducted before the Honorable Barbara F. Newman, J.S.C.  The transcript of the
pretrial proceedings ("Pretrial Tr.") starts at Dkt. 13, at "ECF 1" (referring to the page number
affixed to the document when it was uploaded to the Court's Electronic Case Filing ("ECF")
system).  The transcript of the jury *voir dire* starts at Dkt. 13-2, at 20.  The transcript of
Petitioner's trial, held from October 1, 2014 through October 20, 2014 ("Trial Tr."), starts at
Dkt. 13-4, at 77.  The transcript of Petitioner's sentencing on December 10, 2014 ("Sentencing
Tr."), starts at Dkt. 13-9, at 1089.  When referencing these transcripts herein, this Court will cite
to the transcripts' own internal page numbers, rather than to the page numbers affixed by the
ECF system.

[4] When Petitioner filed the instant Habeas Petition, his counsel also submitted, in hard
copy, a bound "Appendix," which contains certain materials that were before trial court and the

2

At trial, the prosecution presented testimony from several individuals, including eyewitnesses to the shootout, the paramedic who arrived at the scene, the medical examiner who performed an autopsy of Santiago, a ballistics expert, and officers of the New York City Police Department ("NYPD") who were either present on the scene or were later involved in the criminal investigation or the development of the prosecution's case. The defense called one witness, an off-duty police officer who had been in the neighborhood at the time of the shooting, and Petitioner did not take the stand to testify in his own defense.

### 1.   The Events Leading up to the Shootout

The shootout that resulted in Santiago's death took place on September 22, 2009, at 3:20 p.m., on East 146th Street in the Bronx, New York. (Trial Tr., at 43-44, 285-87.) It had been the result of rising tensions between Jason Irrizary ("Irrizary") (the nephew of Elizabeth Thomas (known as "Red"), who was a "loan shark" in the neighborhood), and Robert Vargas ("Vargas") (the teenage son of Barbara Lopez ("Lopez"), an individual who had owed Red money). (*Id.*, at 421, 616-17.)

More specifically, according to the trial testimony of Susana Castro ("Castro"), who lived in the neighborhood and witnessed these events, on September 21, 2009, Red had approached Lopez – at East 146th Street – about the money Lopez owed her. (*Id.*, at 616-17.) According to Castro, Vargas (Lopez's son) was there at the time, and he told Red that Lopez was not going to give her the money and, further, he threatened to shoot Red "in the face." (*Id.*, at 617-19.)

---

courts on direct appeal, including the indictment and the trial exhibits. Although it is this Court's general practice to cite to the transcripts of the state court proceedings that have been submitted by Respondent and filed on the ECF docket, this Court will cite to this Appendix, where necessary.

Castro recalled that, before leaving, Red responded, "Oh, you want to disrespect me. Okay." (*Id.*, at 620.)

Irrizary (Red's nephew) testified at trial that, later that same day, Red told him about Vargas's threat to her. (*Id.*, at 424.) In addition, Irrizary testified that, on the next day, September 22, he, together with Red and two others – Irrizary's brother (Raul Irrizary ("Raul")) and cousin (Manuel Irrizary ("Manuel")) – returned to 146th Street. (*Id.*, at 430.) Irrizary recalled that, once there, Red saw Lopez and confronted her. (*Id.*, at 428.) Irrizary testified that a man named "Gordo" was also present, and that Irrizary, Raul, and Manuel proceeded to get into a "scuffle" or fight with Gordo because they had mistakenly believed him to be Vargas. (*Id.*, at 437-39.) Irrizary testified that, during this fight, Gordo sliced Irrizary's hand with a knife. (*Id.*, at 440-41.) Latroy Ewell ("Ewell") (a friend of Gordo's who witnessed the fight) testified to observing Gordo engage in a fight with the three men and to trying to break it up. (*Id.*, at 587-88.) Castro, who witnessed the fight as well, testified that, when the fight did break up and Irrizary left the scene, Irrizary yelled out: "Clear the block, I'm fucking coming back." (*Id.*, at 624.)

According to Irrizary, he went home after the fight to clean his wound, and then returned to the area of East 146th Street and Willis Avenue about 15 minutes later. (*Id.*, at 444-46.) Irrizary testified that, when he returned, he did not see any of his family members in the area, so he walked into a store on the northeast corner of Willis and East 146th Street to buy a water bottle. (*Id.*, at 447-49.) Irrizary further testified that, when he exited the store and started walking east down 146th Street, he once again encountered Gordo and Ewell. (*Id.*, at 452-56.) According to both Irrizary's and Ewell's testimony, it was at this time that another verbal altercation started between Gordo and Irrizary. (*Id.*, at 453-56; 589-91.)

Another witness who testified at trial, Orlando Soto ("Soto"), recalled that he was coming

out of the laundromat at 420 East 146th Street, on the south side of the street, when he witnessed

this latest argument between Irrizary and Gordo from a car-length's distance.  (*Id.*, at 281-83.)

More particularly, Soto recalled seeing three or four people from the neighborhood – including

his friends Ewell, Gordo, and another man known as "Fifty" – arguing with a group of four or

five Hispanic men whom Soto did not recognize.  (*Id.*, at 251-55, 257-59, 281-85.)  Soto testified

that he had thought, at the time, that a physical fight might break out, so he had stopped to watch

the argument.  (*Id.*, at 255, 260, 286-88.)  Soto recalled that, during this altercation, his friends

had faced west, towards Willis Avenue, while the other men involved had faced east.  (*Id.*, at

285.)

It was soon after this that the shootout occurred.  Multiple witnesses, whose accounts of

the incident varied, testified at Petitioner's trial, and their testimony is summarized below.  For

ease of reference, the relative locations of the buildings mentioned in the witnesses' accounts

(from west to east) are shown here:



### a.   <u>Soto's Account</u>

First, Soto testified that, as he saw his friends begin to walk east on the north side of

146th Street towards Brook Avenue, he heard several gunshots.  (*Id.*, at 287-88.)  Soto stated that

he saw one of the men from the other group (a person he did not know) standing on the sidewalk

at the northeast corner of 146th and Willis, holding a large silver gun straight ahead of him,

pointing east.  (*Id.*, at 260, 262-64, 269, 288-289, 306.)  Soto testified that the man holding the

silver gun was Hispanic, and Soto claimed that he was "sure" that this man was wearing a red

shirt and blue jeans, as well as a baseball cap.  (*Id.*, at 263, 290, 294-95.)  At trial, Soto testified

that the hat was also red, but acknowledged that he was "not too sure" about that.  (*Id.*, at 263,

294-95.)  Soto also conceded that he had not been able to see the whole group of people on the

corner, nor could he be certain as to where the man holding the silver gun had been standing in

relation to the others.  (*Id.*, at 262, 289-90.)  Nor could he recall how many shots were fired or

the direction in which the shooter with the silver gun eventually ran.  (*Id.*, at 265-66, 295.)

Nonetheless, Soto testified that he heard gunfire come from 409 146th Street, and he also

recalled seeing Ewell, who was standing near that building, shoot west "towards the group of

strangers," although Soto could not remember at trial what Ewell had been wearing during the

incident.  (*Id.*, at 264-68, 291-95.)

 As also relevant here, Soto testified that, on the day after the shooting, September 23,

2009, he viewed a lineup at the police precinct.  (*Id.*, at 270.)  Soto recalled that it took him a

"long time" to identify anybody in the lineup, but he ultimately determined that the person in

"position two" had been the shooter carrying the silver gun.  (*Id.*, at 271-73, 276-78, 303.)

During his trial testimony, Soto was shown photographs of the lineup and again said that the

shooter was in "position two."  (*Id.*, at 274-75.)  As later explained to the jury through the

testimony of Detective Bart Snyder ("Detective Snyder"), an investigating detective in the case,

Petitioner had been in lineup position two.  (*Id.*, at 710.)  At trial, however, Soto did not directly

identify Petitioner as the shooter, and, in fact, Soto testified that he would not be able to identify

the person who had held the silver gun because he was "not good with faces after a certain

amount of years."  (*Id.*, at 268-69, 278.)  When asked by defense counsel if he had also been "not

too good with faces" on September 22, 2009 (the date of the shooting), Soto at first replied

"yes," but later said, "I don't know. . . . [W]hen everything happened that day[,] I was able to

remember what happened and saw the face, but now I don't." (*Id.*, at 295-96.)

### b.   Michael Jones's Account

Michael Jones ("Jones"), a self-described "public figure" in the "recording industry,"

who had twice been convicted of petit larceny, testified at trial that, a few minutes before the

shooting started on September 22, 2009, he had parked his car outside the Papa Johns on the

northwest corner of Willis and 146th Street. (*Id.*, at 505-06.) Jones stated that, after getting out

of his car, he had crossed the street to use an ATM, and, as he crossed back to get to Papa Johns,

he brushed up against a man wearing a red shirt. (*Id.*, at 507.) Jones recalled that, after he

bought a pizza, he got into his car and, just after he put on his seatbelt, he heard two shots ring

out. (*Id.*, at 508, 528-29, 535-36.) Jones testified that he then "laid [his] seat all the way back"

to protect himself (*id.*, at 508, 541), and, as he leaned back all the way in his seat, he looked to

the left and, with "a clear line of sight," he saw the same man he had bumped into in the street,

who was wearing a red shirt and holding a gun in front of himself with his right hand (*id.*, at

509-11, 529). At first, Jones testified that he saw this man "let[] off more shots," but later, at

trial, Jones explained that he never actually saw the man in the red shirt fire the gun; rather, he

recalled seeing the man only hold the gun in front of him. (*Id.*, at 509, 535.) Jones also recalled

hearing eight to 10 more shots while he was still in his car (*id.*, at 511, 534), and he stated that, at

one point while he was in his car, he saw the man in the red shirt hand the gun to a man wearing

a white T-shirt, who, in turn, wrapped the gun in another white T-shirt before both men ran off in

opposition directions (*id.*, at 509-10). Jones testified that he believed the shooter was firing a

.9 mm gun. (*Id.*, at 511, 541.)

Continuing with his testimony, Jones recalled that, as he emerged from his car after the gunfire, the man in the red shirt ran right past him.  (*Id.*, at 511.)  Jones testified that, at that point, he went into the Papa Johns, "threw" a baby and mother onto the floor, dove on top of the baby to protect it, and then told someone from Papa Johns to call 911.  (*Id.*)  According to Jones, he heard more shots while inside the pizza shop, but he did not know the direction from which those shots were fired.  (*Id.*, at 534, 547-48.)  Jones testified that, when he came out of the pizza shop, he saw the same man in the red shirt run past him again.  (*Id.*, at 516.)  Jones described the man as Hispanic, wearing jeans, and having a scruffy "wolfing out" beard, with a "low haircut."  (*Id.*, at 515, 526-27.)  Jones explained that he could tell this man had a low haircut because he was not wearing a hat.  (*Id.*, at 527, 536.)  Asked four different times at trial whether the man he saw wearing the red shirt was also wearing a hat, Jones was adamant that he was not.  (*Id.*, at 515, 517, 526-27.)  Jones, who was 5'10" tall, also noted that the man in the red shirt had been a "little taller" than he.  (*Id.*, at 507-08, 526.)  It was later revealed during the trial that Irrizary was 5'11" tall (*id.*, at 437-38) and that Petitioner was 6'2" tall (*see* App'x, at A1309).

During Jones's trial testimony, the prosecution played surveillance video footage that had been recovered from a camera outside Papa Johns.  (*See* Trial Tr., at 512-13.)  While watching that footage, Jones testified that he could see the shooter – wearing red – run by at two different points, once after the first set of shots, and again after the second set of shots.  (*Id.*, at 512-14.)  On cross-examination, Jones conceded that, at one point in the video, the man whom he had identified as the shooter was not wearing a hat, while, at another point, the man whom he had again identified as the shooter *was* wearing a hat.  (*Id.*, at 537-39.)

Finally, Jones testified that, on September 27, 2009 (five days after the shooting), he had identified the shooter as being in position "six" in a photo array, and the prosecution then

introduced the photo array into evidence.  (*Id.*, at 567.)  While looking at the photo array, Jones confirmed at trial that it matched his earlier description of the shooter's facial hair, saying "that's what I call[ed] wolfing out."  (*Id.*)  Over the defense's objection, Jones also testified that he had told the police, "as soon as [Detective Snyder] put the photos . . . in front of me it was right there, I said 'That's him right there, that's the shooter.'"  (*Id.*, at 565.)  Later during the trial, the prosecution displayed the same photo array for the investigating detective, Detective Snyder, who testified that Petitioner had been in "position six."  (*Id.*, at 713.)

### c.     Ewell's Account

Ewell briefly testified that, on September 22, 2009, someone had fired shots at him while he was standing in front of his apartment building at 409 East 146th Street.  (*Id.*, at 592-96.) Ewell could not recall, however, what he saw at the corner of 146th Street and Willis Avenue. (*See id.*)[5]  Ewell testified that, upon shots being fired, he had used his gun in "self-defense."  (*Id.*, at 595.)

### d.     Castro's Account

Castro, who also witnessed the shootout, testified that she was standing on the stoop outside of 417 East 146th Street, waiting for her son to come home from school, when she saw Irrizary and four men who had been with him.  (*Id.*, at 627-41, 663-71.)  According to Castro, Irrizary had started shooting toward 409 East 146th Street, and Ewell and Vargas had fired back from that stoop.  (*Id.*)  Castro stated that two of Irrizary's friends, who were wearing black hooded sweatshirts, had guns as well, but she did not see them fire their weapons.  (*Id.*, at 650-51, 673.)  Castro testified that, during the shooting, she dove to the ground, and, when she

---

[5] In relation to the subject incident, Ewell was indicted for attempted murder, but he later pleaded guilty to possession of a weapon with the intent to use it unlawfully.  (*See* Pretrial Tr., at 51; App'x, at A124.)

looked up, she saw Irrizary shooting a bit farther east, in front of building 413-415.  (*Id.*, at 643-47, 675-77.)  According to Castro, after the shooting stopped, the gunmen scattered.  (*Id.*, at 650-54.)

Castro also testified that, after the shooting, she viewed a photo array at the police precinct and identified Irrizary as the shooter.  (*Id.*, at 655-66, 668-69.)  Castro stated at trial that she recognized Irrizary's face and had "no doubt" in her mind that he was the shooter.  (*Id.*, at 647, 673-74.)

### e.    Irrizary's Account

During the trial, Irrizary claimed that he had nothing to do with the shooting.  (*See id.*, at 456.)  Specifically, Irrizary testified that, after the verbal dispute with Gordo and his friends on September 22, Irrizary suddenly heard an unspecified number of gunshots, but could not tell the direction from which the shots had been fired.  (*Id.*, at 456-57.)  Irrizary recalled that he then ducked and ran between cars and that he could not recall how many – if any – more gunshots he heard after that.  (*Id.*, at 457-62.)  Irrizary testified that he eventually ran down East 146th Street, across Willis, and then east toward Third Avenue to make it to his apartment, and he stated that, while he was running, he did not see any individuals on the sidewalk, although he did see cars passing on 146th Street.  (*Id.*, at 462-64.)  He also recalled that, at some point while he was running, somebody pointed out to him that a person had been shot.  (*Id.*, at 464.)  It was at that time, Irrizary noted, that he "turned around" and saw his stepbrother, Anthony Pena Guzman ("Pena"), lying on the ground in front of a bodega on the corner of Willis and 146th Street, shot in the leg.  (*Id.*, at 464-67.)

During his trial testimony, Irrizary denied seeing himself on the surveillance video (*see id.*, at 472-73).  In addition, while Irrizary acknowledged that his stepbrother Pena was friends

10

with Petitioner, Irrizary testified that he, himself, had known Petitioner only casually around the neighborhood.  (*Id.*, at 467-71.)  Irrizary did testify, though, that he had visited Petitioner in jail while Petitioner was awaiting trial, and that he had put money in Petitioner's commissary as a "favor" to Pena.  (*Id.*, at 496-500.)

### f.    Anthony Flores's Account

During the shootout, the victim, Santiago, had been standing in front of her building at 445 East 146th Street, when she was struck in the chest by gunfire.  (*Id.*, at 748-50, 759-62.)  Santiago's nine-year-old son, Anthony Flores ("Flores"), testified at trial that he had been standing on the top steps of the building while his mother had been standing in the middle of the sidewalk, facing building 445 and talking to a friend.  (*See id.*, at 749-50.)  Flores recalled hearing two shots and then looking towards Willis Avenue, where he saw people scattering.  (*See id.*)  Flores testified that, when he turned back to look at his mother, he saw that she had been shot.  (*Id.*, at 750; 758-59.)

### 2.    The Police's Arrival at the Scene and Investigation

Officer Ronald Juan, who was the first officer to arrive at the scene, testified that he immediately saw "a lot of people . . . running [in] all different kinds of directions," and that people were "yelling" and "screaming."  (*Id.*, at 229.)  Detective Kathleen Evelly, who arrived soon after, testified that, within five minutes after the shooting, at 3:25p.m., there were more than 30 people milling around the northeast corner of Willis Avenue and 146th Street.  (*Id.*, at 413 14.)  Officer Juan testified that, upon arrival, he called for an ambulance and began to secure the crime scene by ordering people away from the area.  (*Id.*, at 228-29.)

At the time of the police's arrival, Santiago was found lying on the stairs of her building, at 445 East 146th Street.  (*Id.*, at 750.)  She had a gunshot wound to her chest and blood oozing

11

from her mouth, and she was not moving.  (*Id.*, at 49.)  The paramedic who arrived on the scene testified that he did not administer any medical care because Santiago exhibited "signs of obvious death."  (*Id.*)

### a.   The Ballistics Evidence at the Scene

Officer Juan testified that he vouchered the ballistics evidence from the scene, but did not personally recover that evidence.  (*Id.*, at 245-46.)  Rather, as was explained at trial by Detective Paul Brown, Crime Scene Unit Detective Glenn Jacklitsch, who was "[t]he lead detective in this investigation" and arrived two hours after the shootout, processed the scene and collected evidence.  (*Id.*, at 64, 192-93.)   According to Detective Brown, Detective Jacklitsch prepared the crime scene reports, took photographs, and created a diagram depicting where he had collected the 25 pieces of evidence recovered at the scene.  (*Id.*, at 64-66.)

Despite his personal involvement with the investigation, Detective Jacklitsch did not testify at trial.  (*See generally id.*)  According to the prosecution, Detective Jacklitsch was "retired" at the time of trial, so Detective Brown, also a member of the Crime Scene Unit, was called to testify in Detective Jacklitsch's stead.  (*Id.*, at 59-60.)  The substance of Detective Brown's testimony will be discussed more thoroughly below (*see* Background, *infra*, at Section B(2)(a)(i)), but this Court notes that, among other things, Detective Jacklitsch recorded that he had found .45 expelled casings at the corner of Willis Avenue and 146th Street, .9 mm casings in front of 409-411 East 146th Street, shell casings from a .22 caliber rifle or cartridge inside of a fenced area of 413 and 415 East 146th Street, and a deformed .45 caliber copper jacketed bullet inside the trunk of a car parked in front of 455 East 146th Street, which was in the relative vicinity (and east) of Santiago.

b.    **The Autopsy**

Dr. Margaret Prial, the medical examiner who performed Santiago's autopsy, testified at

trial that it was impossible to determine what kind of bullet had killed Santiago.  (*Id.*, at 798-

800.)  Dr. Prial concluded that the person who had fired the fatal shot could have been anywhere

from 10 to over 100 feet away.  (*Id.*, at 798-803, 806.)  Moreover, Dr. Prial could determine

neither where the shooter had been standing, nor the direction from which the bullet had

traveled.  (*See id.*)

c.    **The Police's Identification of Petitioner as the Main Suspect**

After being seen by officers, Petitioner was apprehended at the scene and taken into

custody on the date of the shooting, September 22, 2009 (*see* Pretrial Tr., at 105), and was then

formally arrested the next day, September 23, 2009 (*id.*, at 105-06).  As discussed above, Soto

(from a lineup on September 23) and Jones (from a photo array on September 27) each identified

Petitioner as the shooter.  (Trial Tr., at 270-73, 567.)  In addition, Irrizary's stepbrother, Pena,

who had been taken to the hospital after the shooting, stated to Detective Joseph O'Neil (another

officer who testified at the pretrial proceedings), that Petitioner had been involved in the

shooting.  (Pretrial Tr., at 139-40.)  According to Detective O'Neil's testimony, Pena stated to

him that Petitioner had been the "big guy shooting down the street."  (*Id.*, at 140.)

Around this same time, however, Castro identified Vargas and Irrizary as the shooters.

(*See id.* at 106; *see also* Trial Tr., 655-66.)  According to Detective Snyder (another investigating

detective who testified in this case), on the day after the shooting, Lopez's son, Vargas, was

arrested and charged with attempted murder for "shooting into a crowd."  (Pretrial Tr., at 40-41.)

Detective Snyder also testified that, at another point in the investigation, Irrizary was taken into

custody and provided a statement to detectives, although he was not arrested for Santiago's

death.  (*Id.*, at 49.)  As noted above (*see supra* n.5), Ewell was arrested in November 2009 and charged with attempted murder for his alleged role in the shootout (Pretrial Tr., at 51), but he later pleaded guilty to possession of a weapon with the intent to use it unlawfully.  Ewell had not yet been sentenced at the time of Petitioner's criminal trial.  (*See also* App'x, at A124.)

### B.   **Procedural History**

#### 1.   **Indictment**

On October 8, 2009, Petitioner was indicted on charges of second-degree intentional murder (*see* N.Y. Penal Law § 125.25(1)); second-degree depraved indifference murder (*see* N.Y. Penal Law § 125.25(2)); first-degree intentional manslaughter (*see* N.Y. Penal Law § 125.20(1)); second-degree reckless manslaughter (*see* N.Y. Penal Law § 125.15(1)); and second-degree criminal possession of a weapon (*see* N.Y. Penal Law § 265.03).  (*See* App'x, at A7-10, A31.)

#### 2.   **Trial**[6]

##### a.   **The Prosecution's Case-In-Chief**

At trial, it was the prosecution's theory that Santiago had died as a result of Petitioner's shooting a .45 caliber gun eastward, and that, based on the evidence, the only shooter who could have caused Santiago's gunshot wound was Petitioner.  (*See* Trial Tr., at 27-28.)  More particularly, according to the prosecution, Petitioner had been summoned to the scene with his

---

[6] Prior to trial, the court held *Sandoval*, *Dunaway*, *Wade*, and *Gethers* hearings, pursuant to:  (1) *People v. Sandoval*, 34 N.Y.2d 371 (1974), to determine whether evidence of Petitioner's criminal record would be admissible at trial, if he chose to testify; (2) *Dunaway v. New York*, 442 U.S. 200 (1979), to determine whether there was probable cause for Petitioner's arrest; (3) *United States v. Wade*, 388 U.S. 218 (1967), to determine whether Petitioner's pretrial identification was the result of impermissibly suggestive procedures; and (4) *People v. Gethers*, 86 N.Y.2d 159, 161 (1995), to determine whether probable cause existed to detain Petitioner pending an "on-the-scene confirmatory identification."  (*See* App'x, at A63-80.)  Petitioner has not challenged any pretrial rulings in his habeas Petition.

gun by Irrizary, who had a motive for the gunfight.  (*See id.*, at 25-27.)  The prosecution posited

that Petitioner had stood on the corner of Willis Avenue and 146th Street and had fired eastward

towards Brook Avenue, targeting Ewell and Vargas, who were standing in front of 409 East

146th Street; Ewell and Vargas fired back in self-defense at Petitioner – westward.  (*Id.*, at 27.)

As Santiago had been positioned farther east than Ewell and Vargas, at 445 East 146th Street, it

was the prosecution's theory that Petitioner's gun must have fired the fatal bullet that caused her

death.  (*Id.*, at 28-29.)  In other words, it was the prosecution's theory that Vargas and Ewell –

who were positioned west of Santiago – could not have caused her death, as they were shooting

at Petitioner in self-defense and, therefore, had no occasion to shoot in an eastward direction,

towards Santiago.  (*See id.*, at 28-30.)

> ### i.  Detective Brown's Testimony and the Admission of Photographs, Crime Scene Reports, and Crime Scene Diagrams

To support this theory, during the trial, the prosecution not only relied on eyewitness

testimony (which has been summarized above), but it also relied heavily on the testimony of

Detective Brown, who had been called to testify in place of Detective Jacklitsch, the retired lead

crime scene investigator who had taken photographs of the scene and prepared crime scene

reports and a ballistics diagram.  (*See id.*, at 64.)  At the start of his testimony, Detective Brown

gave an overview of the required training for a crime scene investigator and explained that

processing a crime scene requires a crime scene investigator to follow a special step-by-step

"protocol."  (*Id.*, at 57-62.)  He stated that "all of [the] information in this case c[a]me from

[Detective] Jacklitsch's reports" (*id.*, at 59-60, 125), and that he had prepared for the trial by

reviewing Detective Jacklitsch's notes and reports and by speaking with the prosecutor (*id.*, at

64-65).  Detective Brown testified that he personally visited the crime scene three weeks before

trial – five years after the crime – to get a "feel of the location," so that he would "feel comfortable testifying." (*Id.*, at 65-66, 70.) Detective Brown explained that he did not take any notes or photographs during that pretrial visit. (*Id.*, at 70.)

During Detective Brown's testimony, the prosecution sought to introduce several exhibits as business records, including (1) photographs that Detective Jacklitsch took of the crime scene; (2) Detective Jacklitsch's crime scene reports, which were introduced collectively as a single exhibit, characterized by Detective Brown as a "combination of the reports that [were] generated by the [sic] Detective Jacklitsch in regards to this investigation" (herein, referred to as the "crime scene report" in the singular); (3) a diagram that Detective Jacklitsch prepared of the crime scene, showing where he had found each piece of evidence; and (4) a diagram that Detective Brown created that, he testified, was meant to "duplicate" Detective Jacklitsch's diagram. (*See id.*, at 66-67, 107; *see also* App'x, at A1684-1729.) Detective Brown testified that Detective Jacklitsch had created the original diagram, report, and photographs while working for the NYPD; that he had been under a duty to record information accurately in the report; that protocol dictated that officers generate reports contemporaneously with crime scene processing; and that Detective Jacklitsch had been the custodian of the records at issue. (*Id.*, at 68, 100-01, 105.) Detective Brown's testimony regarding these materials may be summarized as follows:

- The photographs depicted all of the 25 pieces of evidence that Detective Jacklitsch had collected. (*Id.*, at 87-88.) Detective Brown did not know whether any of the evidence depicted in the photographs had been moved, or where each piece of evidence had been located before the photographs had been taken. (*Id.*, at 85-86.)

- The crime scene report contained the same photographs in a thumbnail version, along with information about "how [each] photo[graph] was taken . . . the direction in which the photo[graph] was taken[,] and the location in question, and the brief description of what the photo[graph] is." (*Id.*, at 88.) The

16

crime scene report also included written descriptions of each piece of evidence, what Detective Jacklitsch had believed each piece of evidence to be, and where he had found that evidence. (*Id. See also* App'x, at A1684-1727.)

- Detective Brown had browsed the handwritten field report that Detective Jacklitsch prepared, which purportedly formed the basis of Detective Jacklitsch's typed report that the prosecution wanted to enter into evidence, but Detective Brown did not compare the two. (*Id.*, at 84-85.) As for the measurements included in Detective Jacklitsch's report, Detective Brown had "an idea" of who took them, but he did not know what instrument was used to take those measurements, or the accuracy of that instrument. (*Id.*, at 86, 107.) According to Detective Brown, in 2009, Crime Scene Unit investigators had access to "a tape measure, and a wheel measuring device." (*Id.*, at 107.)

- In making his own diagram of the crime scene a few weeks before trial, Detective Brown's goal had been to "duplicate" Detective Jacklitsch's diagram. (*Id.*) Detective Brown used Detective Jacklitsch's diagram as the template for where to place all 25 pieces of evidence on his own diagram, including the ballistics evidence. (*Id.*, at 122, 143.) Using Google Maps "to get that same location," Detective Brown then used Detective Jacklitsch's diagram and photographs "to duplicate what he did," and, "by looking at Detective Jacklitsch's diagram and taking measurements from his diagram," Detective Brown believed he "was able to plot the measurements of the possible evidence that was collected." (*Id.*, at 107, 143.) Detective Brown acknowledged that these plotted measurements were "not exact," but described them as "an approximate location of where all of the evidence was located." (*Id.*, at 143.)

- Lastly, Detective Brown's diagram, like Detective Jacklitsch's, showed the locations where Detective Jacklitsch found each of the 25 pieces of evidence, with small directional line markers leading to a numbered piece of evidence. (*Id.*, at 140.) Detective Brown added a color-coded key to his diagram, listing the 25 pieces of evidence, and also added a "J" in front of each number to represent that Detective Jacklitsch had collected the evidence. (*Id.*, at 140-41.) Detective Brown acknowledged that there were some differences in the diagrams. (*See id*.) For example, in Detective Jacklitsch's diagram, the distance on 146th Street from Willis Avenue to the victim was shown as 536 feet, and, in that diagram, there appeared to be a slight curve in the road. (*Id.*, at 140.) In contrast, on Detective Brown's diagram, the same

17

distance was marked as 544 feet, and the curve was less
pronounced.  (*Id.*, at 141.)  Detective Brown testified that this
discrepancy had occurred because he used measurements from a
"Google map sketching" (*id.*), and he noted that he could not be
sure how Detective Jacklitsch made his measurements, but he
assumed that they were made while "walking . . . and sketching"
(*id.*, at 141, 146).

After conducting *voir dire* with respect to Detective Jacklitsch's photographs, crime
scene report, and diagram, as well as Detective Brown's own diagram, which was created from
Detective Jacklitsch's work, Petitioner's counsel objected to the admission of all of these trial
exhibits.  (*Id.*, at 86-89, 92, 104-105, 112-13.)

Starting with the photographs and the crime scene report, Petitioner's counsel objected to
the introduction of these materials on the ground that Petitioner was being denied his "*Crawford*
right to confrontation of the individual who was there and took those photographs, [and who]
made those measurements."[7]  (*Id.*, at 89.)  Petitioner's counsel argued that he was unable to
"cross examine anybody regarding measurements, [and] regarding where anything was found."
(*Id*.)  Further, he contended that it was unclear whether Detective Jacklitsch was truly
unavailable to testify or whether "[he was] in Florida and [did not] want to pay for the trip."
(*Id*.)  Petitioner's counsel then argued that the documents at issue (the photographs and the crime
scene report) were "testimonial," given that they were not just "being introduced for [the]
purpose[] [of] establish[ing] some fact."  (*Id.*)  Rather, according to counsel, those materials were
being introduced "to establish that [Petitioner] was the shooter and this is where he was based on
what is essentially set forth in those documents; where shell casings were found, [including for a]
forty-five caliber, nine millimeter" firearm.  (*Id.*)  As stated by counsel, "those statements in
there as to measurements and where things were found [were] testimonial in nature," as they

---

[7] *See Crawford v. Washington*, 541 U.S. 36 (2004).

"explicitly" went "to the accusation part that it was [Petitioner] who committed the crime." (*Id.*, at 96.) Pointing out that the issue of bullet trajectory was critical to this case, defense counsel contended that, by not being able to probe about the "exact measurements," the court was denying counsel "the right to render a viable defense to this case[,] to say this couldn't have possibly happened." (*Id.*, at 90.) Ultimately, it was defense counsel's position that, by being "denied the right to cross-examine the crime scene investigator who drew up all of these documents, and who wrote it down and who did the measurements and everything else [*i.e.,* Detective Jacklitsch]," Petitioner's constitutional right of confrontation was being abridged. (*Id.*, at 89-90.)

After a recess, the trial court found that the introduction at trial of the crime scene report and the corresponding photographs did "not violate the *Crawford* rule," and noted defense counsel's exception. (*Id.*, at 96.) The court then received the documents in evidence. (*Id.*, at 96-97.)

Immediately thereafter, Petitioner's counsel objected to the introduction of both Detective Jacklitsch's and Detective Brown's diagrams. (*Id.*, at 104-05.) Counsel first argued that Detective Jacklitsch's diagram was not a business record because the Detective had not been required to prepare it, and that its admission violated Petitioner's confrontation rights. (*Id.*) Counsel also objected to the admission of Detective Brown's diagram, as well as to an enlarged, black-and-white-version of the same, "for the same reasons." (*Id.*, at 112-13.) Lastly, counsel argued that Detective Jacklitsch's diagram was not accurate, which was harmful to Petitioner, because it was "going to let the jury see that oh[,] it's possible that a bullet would have wound up over there." (*Id.*, at 104-05.)

In opposition, the prosecution contended that both Detective Jacklitsch's and Detective Brown's diagrams were not testimonial because "[Detective] Jacklitsch's diagram [just] show[ed] the location of evidence." (*Id.*, at 93.) The prosecution also argued that, at the very least, Detective Brown's diagram was accurate, stating that: "[Detective] Brown's diagram [] ha[d] the key, [and also] ha[d] more accurate building structures than [Detective] Jacklitsch's diagram. It show[ed] the location of evidence, where things were recovered, nothing more, nothing less." (*Id.*)

Upon hearing these arguments, the trial court rejected defense counsel's contentions, finding that they went "to weight [of the evidence], not admissibility." (*Id.*, at 105.)

At trial, Detective Brown went on to testify for over 100 transcript pages about the evidence that Detective Jacklitsch had collected, and the jurors were given a copy of Detective Brown's diagram, to use to follow along with his testimony. (*Id.*, at 106-28, 137-68, 192-206.) Among other things, Detective Brown provided information about each photograph taken, including where he believed Detective Jacklitsch had been standing when he took each photograph, what Detective Jacklitsch had said each photograph depicted, and where the evidence in the photograph could be found on the diagram. (*See id.*) Throughout his testimony, Detective Brown noted that he was relying on Detective Jacklitsch's report. (*See id.*, at 122-23, 125.) For example, Detective Brown testified that one photograph (photograph 22) portrayed "an overall view of some of the ballistic evidence" that Detective Jacklitsch had collected on the corner of Willis Avenue and 146th Street. (*Id.*, at 122.) Detective Brown specifically testified that, according to Detective Jacklitsch's report, Detective Jacklitsch had recovered six casings discharged from a .45 caliber Winchester at that corner, while he had also recovered discharged bullets from a .9mm firearm in front of 409 East 146th Street (*see id.*, at 122-24). At trial,

Detective Brown continued testifying in this manner, going through each entry in Detective Jacklitsch's crime scene report.  (*See id.*, at 147-203.)  He also stated that, based on Detective Jacklitsch's notes, there had been no test for blood evidence at the scene, nor were there tests for traces of copper, lead, or brass.  (*Id.*, at 200-01.)

### ii.     Detective Fox's Testimony and the Prosecution's Continued Reliance on the Crime Scene Evidence

After Detective Brown's testimony, the prosecution continued to rely on the diagrams, as well as on Detective Jacklitsch's crime scene report, when it called Detective Jonathan Fox, a member of NYPD's Firearms Analysis Section, to testify as a ballistics expert.  (*See id.*, at 320, 328.)  Detective Fox, who had analyzed the ballistics evidence collected from the scene, specifically referenced both Detective Brown's diagram and Detective Jacklitsch's crime scene analysis throughout his trial testimony.  (*See id.*, at 328-29, 336.)  For example, Detective Fox explained that, in his report, Detective Jacklitsch had indicated that six Winchester .45 caliber cartridge casings had been found in front of the corner of Willis Avenue and 146th Street; that seven .9 mm casings had been found in front of 409-411 East 146th Street; that shell casings from a .22 caliber rifle or cartridge had been found inside of a fenced area of 413 and 415 East 146th Street; that a deformed .45 caliber copper-jacketed bullet had been found inside the trunk of a car parked in front of 455 East 146th Street; and that a possible "BIM (Ballistic Impact Mark) had been found in front of Santiago's building, 445 East 146th Street.  (*See id.*, at 328-29, 334-38, 344-47).  According to Detective Fox, the six .45 caliber casings – found near the corner of Willis Avenue and 146th Street – had been fired from the same firearm, and, likewise, the seven .9 mm casings – found in front of 409-411 East 146th Street – had been fired from the same gun.  (*See id.*, at 336-37.)  Detective Fox noted, though, on cross-examination, that, that,

while a .45 semi-automatic ejects cartridges, a .45 caliber revolver would not, so it was possible that two .45 caliber weapons were used during this incident.  (*Id.*, at 356-57.)

Additionally, throughout the trial, most eyewitnesses referred to Detective Brown's diagram to illustrate their own locations during the shootout.  (*See id.*, at 254-56 (Soto Testimony); 431, 457 (Irrizary Testimony); 530-32 (Jones Testimony); 623-24, 637-39, 644-45 (Castro Testimony); 751-52 (Flores Testimony).)  Further, 10 days into the trial, over defense counsel's objection, the trial court allowed the jury to visit the crime scene, accepting the prosecution's contention that the diagrams and photographs "d[id] not truly [do] justice to the nature of this crime scene."  (*Id.*, at 375-76.)  The jurors were driven to the corner of Willis Avenue and 146th Street, as well as to 445 146th Street, where Santiago was killed, and they took Detective Brown's diagram with them for this site visit.  (*Id.*, at 374-76, 386-88, 767-70.)

### b.  The Defense's Case

The defense called one witness, off-duty NYPD officer Berlinda Acevedo, who testified that, on September 22, 2009, she was sitting in the courtyard of 510 East 146th Street, across the street from 445 East 146th Street.  (*Id.*, at 811-814.)  Officer Acevedo testified that, at around 3:20 p.m., she heard a series of five shots, a pause, and then two more shots.  (*Id.*, at 814.)  Officer Acevedo stated that, after she heard the gunshots, she "saw a male black wearing a red shirt" running east from Willis Avenue towards Brook Avenue on 146th Street.  (*Id.*, at 812, 814.)  On cross-examination, Officer Acevedo noted that she did not see whether the man running was carrying a weapon.  (*Id.*, at 815.)  She testified that, after shots were fired, she called 911.  (*Id.*, at 814-15.)

c.     **Summations**

On summation, defense counsel argued that the prosecution had not proven beyond a reasonable doubt that Petitioner was the person who had fired the fatal shot, or that the fatal shot had even come from a .45 caliber gun fired from the corner of Willis and 146th Street.  (*Id.*, at 895-97.)  In this regard, counsel noted that, based on the ballistics evidence, there might have been two .45 caliber guns fired that afternoon, and, notably, that it could have been any of the people shooting that day who fired the fatal shot, especially as the medical examiner could not determine what type of bullet had, in fact, killed Santiago.  (*Id.*, at 918-19, 922-27.)  Defense counsel further contended that both Soto's and Jones's identifications of Petitioner had not been reliable, but that Castro's identification of Irrizary as the shooter had been.  (*See id.*, at 898-916.)

In its closing argument, the prosecution acknowledged that this was not an "easy case," given that the eyewitnesses "saw things differently" (*id.*, at 939-40), but nonetheless relied on the ballistics evidence to theorize that Petitioner had stood on the northeast corner of Willis Avenue and 146th Street, shooting a .45 caliber gun eastward, towards Vargas's building at 409 146th Street.  (*Id.*, at 948.)  The prosecution argued that Vargas and Ewell shot back, facing west.  (*Id.*)  According to the prosecution, the bullet that struck Santiago – who had been standing east of building 409 – must have come from Petitioner's gun because Detective Jacklitsch had found a discharged .45 caliber bullet east of Santiago.  (*Id.*, at 947-50, 991.)  The prosecution contended that Castro had been mistaken in her belief that Irrizary was the one shooting east, and, relying on Detective Brown's crime scene diagram, argued that the cars on the street must have blocked Castro's view.  (*Id.*, at 958.)  In contrast, according to the prosecution, Soto and Jones were truthful witnesses whose identifications were accurate (*id.*, at 965-83), and Ewell had, in fact, corroborated Soto's testimony by explaining that Ewell had fired in "self defense" in response to

Petitioner's shots (*id.*, at 949, 983-84).  Ultimately, throughout its summation, the prosecution referenced the ballistics evidence located on Detective Brown's crime scene diagram, arguing that the "crime scene evidence[] speaks for itself."  (*Id.*, at 950.)

### d.      The Verdict and Sentencing

The jury was charged to consider five counts in the alternative:  second-degree intentional murder, second-degree depraved indifference murder, first-degree intentional manslaughter, second-degree reckless manslaughter, and second-degree criminal possession of a weapon.  (*Id.*, at 1022-38.)  During its two days of deliberations, the jury asked for (presumably Detective Brown's) crime scene diagram twice, before and in conjunction with the surveillance video.  (*See, e.g., id.*, at 1081; *see also* App'x, at A25, A28 (Jury note:  "During the viewing of the video, we request to have the diagram with us.").).  Ultimately, in reaching a verdict, the jury acquitted Petitioner of both murder counts, but found him guilty of first-degree manslaughter. (*Id.*, at 1090-91.)

On December 10, 2014, the trial court sentenced Petitioner, as a second felony offender, to the maximum term of 25 years' imprisonment and five years' post-release supervision.  (*See* Sentencing Tr., at 22-23.)

### 3.      Direct Appeal

### a.      Petitioner's Appellate Argument

Petitioner, represented by appellate counsel, timely filed a direct appeal from his conviction.  (*See* Pet. ¶ 9.)  In his opening brief to the Appellate Division, First Department, Petitioner argued, *inter alia*, that Detective Jacklitsch's crime scene report, photographs, and diagram, as well as Detective Brown's duplicative diagram, were "testimonial" in nature and therefore inadmissible through a surrogate witness.  (*See* Declaration of Marianne Stracquadanio,

Esq., dated Mar. 19, 2019 ("Stracquadanio Decl.") (Dkt. 11), Ex. 1 (Brief for Defendant-

Appellant ("Pet. App. Br.")), at 45-59).)[8]  More specifically, relying on the principles set forth

by the Supreme Court in *Crawford*, 541 U.S. at 51-52, *Bullcoming v. New Mexico*, 564 U.S. 647,

657 (2011), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), Petitioner argued that:

> [A]ll of the documents and photographs prepared by
> [Detective] Jacklitsch, as well as the duplicative diagram prepared
> by [Detective] Brown, unquestionably qualified as testimonial.
> The photos, report, and diagrams' 'purpose,' if not 'sole purpose,'
> was to codify evidence for use in the prosecution of a homicide,
> and they were created by police officers themselves.  They
> contained 'the precise testimony [Detective Jacklitsch] would be
> expected to provide if called at trial.'  *Melendez-Diaz*, 557 U.S. at
> 310, 316 (explicitly rejecting the logic that would render 'a police
> officer's investigative report describing the crime scene admissible
> absent an opportunity to examine the officer').

(Pet. App. Br., at 47-48.)

In analyzing the specific aspects of the materials that Detective Jacklitsch prepared

during the criminal investigation, Petitioner noted that:

> The [trial] court here failed to explain why it found these
> testimonial documents admissible, but it could not have been
> because these documents were machine-generated, which have
> been found to be non-testimonial.  *See People v. Brown*, 13 N.Y.3d
> 332, 340 (2009) (non-testimonial when report 'consisted of merely
> machine-generated graphs, charts and numerical data').  On the
> contrary, the crime scene report, photographs, and diagrams all
> required skill and interpretive acumen to produce.  Based on
> [Detective] Brown's testimony, all of the documents and
> photographs [Detective] Jacklitsch created as the crime scene

---

[8] Also on direct appeal, Petitioner argued that the verdict was against the weight of the evidence; he was deprived of a fair trial when the court permitted the prosecution to elicit certain hearsay evidence; he was denied his right to effective assistance of counsel when his attorney accidentally opened the door to the admission of identification evidence from Jones that the jury would not otherwise have heard; he was denied a fair trial where the trial court improperly required a witness (Ewell) to incriminate himself on an open criminal matter and placed significant restrictions on Petitioner's ability to question that witness; and his 25-year sentence, the maximum permitted, was unduly harsh.  (*See generally* Pet. App. Br., at 1-93.)  Petitioner has not re-asserted any of these arguments in his Habeas Petition.  (*See generally* Pet.)

> detective required years of experience, specialized training and
> skill, and scrupulous adherence to 'protocol.'  ([Trial Tr.], at
> 57-62.)
>
> [Moreover, a]fter processing the crime scene, [Detective]
> Jacklitsch engaged in interpretive and deliberative work reflecting
> his impressions.  According to [Detective] Brown, [Detective]
> Jacklitsch digitally rendered 146th Street between Willis Avenue
> and Brook Avenue, filling in the house numbers, and placing
> 43 cars on the road.   He gave each piece of evidence a number
> from one to 25, and added the evidence to the diagram using small
> directional line markers, indicating where he found each piece of
> evidence.  He also added measurements.

(*Id.*, at 48.)

Petitioner also emphasized that Detective Jacklitsch's crime scene report not only

contained descriptions of the evidence, but also contained notations regarding his beliefs about

the evidence's value in the investigation.  (*See id.*, at 48-49.)  Petitioner pointed out that:

> The formal, labeled, and typed crime scene report included
> descriptions of each piece of evidence [Detective] Jacklitsch
> found, where he found it, and *what he believed it to be.*  For
> example, [Detective] Jacklitsch labeled the first entry 'J1,' and
> wrote that he believed it was a casing from a 'Winchester 45 auto,'
> that it was of *"probative"* value, and included measurements of
> where he found it relative to Willis Avenue.  The report also
> included thumbnail images of all of [Detective] Jacklitsch's photos
> introduced into evidence, and blank spaces for images that were
> not shown to the jury.  Next to each image or redacted image,
> [Detective] Jacklitsch wrote a brief description of what it depicted,
> noted which way he directed the camera, and described the camera
> distance using adjectives like 'mid-range' and 'closeup.'  It is
> clear, then, that these exhibits reflected the careful and
> *discretionary* steps [Detective] Jacklitsch took to measure and
> document evidence for prosecution.

(*Id.*, at 49 (emphasis added).)

"Thus," Petitioner contended, with respect to the diagram, photographs, and crime scene

report that were prepared by Detective Jacklitsch, "the People were required to introduce [those

materials] through the person who actually created them, in order to provide the defense with a

fair opportunity to cross-examine him regarding not only the information and interpretive data, but also his 'proficiency, the care he took in performing his work, and his veracity.'" (*Id.* (quoting *Bullcoming*, 564 U.S. at 661 n.7).)

As a final point, Petitioner emphasized that, not only did the introduction of Detective Jacklitsch's crime scene report, photos, and diagram violate his confrontation rights, but that "the introduction of [Detective] Brown's own diagram did as well." (*Id.*, at 50.)  While acknowledging that Detective Brown had appeared to testify at trial, it was Petitioner's position that Detective Brown "could not be effectively cross-examined on his diagram because it was merely a duplicate of [Detective] Jacklitsch's," and, thus, the introduction of the duplicative diagram was itself a violation of the Confrontation Clause where Detective Jacklitsch was not made available to testify.  (*Id.*)  According to Petitioner, "[a] hypothetical the Supreme Court posed in *Bullcoming* ma[de] this plain." (*Id.*, at 51.)  In *Bullcoming*, the Supreme Court had posed the following question:  "[S]uppose a police report recorded an objective fact [such as] the address above the front door of a house or the read-out of a radar gun.  Could an officer other than the one who saw the number on the house or gun present the information in court[?]" *Bullcoming*, 564 U.S. at 659-60.  The Court, in response, answered:  "As our precedent makes plain, the answer is emphatically 'No.'" *Id.* (internal citations omitted).  Pointing to that discussion in *Bullcoming*, Petitioner concluded that, "[i]f it would violate the Confrontation Clause to admit a report that recorded a purely objective fact if [the] defense did not get a chance to cross-examine the person who recorded that fact, then surely it was error [in this case] to admit a 'duplicate' diagram based solely and entirely on a non-testifying officer's crime scene diagram." (Pet. App. Br., at 51.)

b.    **The People's Opposition**

In opposition, the People argued first that, in this case, the "purpose of the Confrontation Clause was not thwarted by the admission of the crime scene report and diagrams, since the information contained therein did not constitute 'statements' for *Crawford* purposes." (*See* Stracquadanio Decl., Ex. 2 (Respondent's Brief ("Resp. App. Br.")), at 20-21.) Instead, according to the People, "these items were merely an inventory of the ballistic evidence found at the scene as well as photographs of what the evidence looked like and where [it was] located." (*Id.*, at 21.) Nonetheless, the People maintained that, "to the extent that the information contained within [Detective Jacklitsch's] report or [the] diagrams could be construed as 'statements,'" such statements were not testimonial, as "the actions taken by Det[ective] Jacklitsch in collecting the evidence and memorializing this collection in his report and diagram was mere information gathering and reporting, rather than the formation of a conclusion that pertained to [Petitioner's] involvement in the crime." (*Id.*, at 21-22 (citing New York State cases).) "Put differently," the People argued, "there [was] nothing testimonial about Det[ective] Jacklitsch's report and diagram, because the information contained therein was not a substitute for the testimony of a person who was accusing [Petitioner]; in fact, the report and diagram reflect[ed] only an assessment of what potential evidence existed at the scene." (*Id.*, at 22.) Indeed, according to the People:

> In this way, the crime scene report and diagram [were] similar to autopsy reports; like an autopsy report, which is 'concerned only with what happened to the victim, not with who killed [the victim],' *People v. Freycinet*, 11 N.Y.3d 38, 42 (2008), here, the crime scene report [was] concerned only with what was found at the scene, not with who did it.

(*Id.* (citing New York State cases).)[9]

"At best," the People contended, "the only arguable testimonial piece of evidence in this case was Det[ective] Brown's diagram" (given that it "was prepared years after the crime scene was processed"), but, according to the People, that diagram "still d[id] not accuse [Petitioner] by linking him to the scene." (*Id.*, at 25.)  According to the People, even "[a]ssuming *arguendo* that Det[ective] Brown's diagram was testimonial, because it was created in preparation for [Petitioner's] prosecution," the admission of that diagram nevertheless "[did] not raise a confrontation issue, since it was introduced through the testimony of Det[ective] Brown himself, who was vigorously cross-examined."  (*Id.*)

Finally, the People maintained that, "[i]f there was any error in the introduction of these items into evidence, it was harmless," as, in the People's view, there "[was] no doubt" that the "shooter was standing near the corner of Willis Avenue, shooting eastbound towards Brook Avenue, in the direction of Ewell and Vargas."  (*Id.*)  According to the People, "[t]here was no alternative second theory put forth by the defense" at trial with respect to the People's assertion that a shooter had been located at the northeast corner of Willis Avenue and East 146th Street. (*Id.*, at 26.)  Rather, according to the People, defense counsel had focused "his summation [on] poking [other] holes in the People's case," such as by contending that it was Irrizary, not Petitioner, who had been that shooter, or that there had been two .45 caliber guns at the scene.

---

[9] In *People v. Freycinet*, quoted above by the People, the New York Court of Appeals looked to state law to fashion four factors that, in its view, were relevant to determining whether a statement was "testimonial" under *Crawford.  See Freycinet*, 11 N.Y.3d at 41. Those factors included:  (1) "the extent to which the entity conducting the procedure is an arm of law enforcement"; (2) "whether the contents of the report are a contemporaneous record of objective facts, or reflect the exercise of fallible human judgment"; (3) "whether a pro-law-enforcement bias is likely to influence the contents of the report"; and (4) "whether the report's contents are directly accusatory in the sense that they explicitly link the defendant to the crime."  *Id.* (internal quotation marks and citations omitted).

(*Id.*, at 26.)  Ultimately, the People asserted, the crime scene report and diagrams "had no bearing on the defense's theory of the case," and thus "there [was] no reason to believe that the jury's verdict would have been any different had these items been excluded."  (*Id.*)

### c.      The Appellate Division's Decision

By Decision and Order dated June 8, 2017, the Appellate Division unanimously affirmed Petitioner's conviction and sentence.  *People v. Diaz*, 151 A.D.3d 502, 503-04 (1st Dep't 2017). (*See* App'x, at A1915-18.)  As relevant here, the Appellate Division held that:

> [t]he crime scene evidence that [Petitioner] claim[ed] was admitted in violation of his right of confrontation was not testimonial, since it '[did] not link the commission of the crime to a particular person' (*People v. John*, 27 N.Y.3d 294, 315 [2016]; *see also People v. Freycinet*, 11 N.Y.3d 38, 42 [2008]; *People v. Acevedo*, 112 A.D.3d 454, 455 [1st Dept 2013], *lv denied* 23 N.Y.3d 1017 [2014]).  In any event, any error in admitting the crime scene report and diagrams prepared by a nontestifying officer was harmless under the standard for constitutional error (*see People v. Crimmins*, 36 N.Y.2d 230 [1975]), because evidence showing the locations where the officer found cartridge cases and other ballistic evidence shed little or no light on any of the disputed issues at trial, and there is no reasonable possibility that this evidence affected the verdict.

151 A.D.3d at 503-04.

### d.      Petitioner's Application For Leave To Appeal to the Court of Appeals

Petitioner, through appellate counsel, sought leave to appeal to the New York Court of Appeals, first by filing a letter that included copies of the appellate briefs (*see* App'x, at A1919-20), and then by supplementing that letter with one that specifically addressed certain issues (*see* Letter to the Honorable Leslie E. Stein from Rachel T. Goldberg, Esq., dated July 24, 2017 ("Goldberg 7/24/17 Ltr.") (Dkt. 11-3)).  In the supplemental letter, Petitioner's counsel argued

that the Court of Appeals should grant leave "to address two preserved issues" in the case,

which, counsel contended, were of significant import:

- Does the Confrontation Clause of the Sixth Amendment or the State Constitution apply to police-created crime reports if police have not yet identified a suspect in the crime?

- Do police crime scene reports fall under the "business records" exception to the ban on hearsay evidence?

(*Id.*, at 1-2.)  In the body of the letter, counsel went on to address each question, and, as relevant

here, addressed not only state law, but also the federal Confrontation Clause issue.  (*See id.*, at 6-

8 (citing, *inter alia*, U.S. Const., amend. VI; *Crawford*, 541 U.S. at 51-52; *Davis v. Washington*,

547 U.S. 813, 822 (2006); *Melendez-Diaz*, 357 U.S. at 310-11; *Bullcoming*, 564 U.S. at 664).)

On August 24, 2017, the Court of Appeals denied Petitioner leave to appeal.  *People v.*

*Diaz,* 86 N.E.3d 567 (2017).  (*See* Pet. ¶9(g)(4).)

## C.     Federal Habeas Petition

Petitioner commenced this action by filing a Petition on October 23, 2018.[10]  (*See* Pet.)

Petitioner argues that the trial court violated the Confrontation Clause of the Sixth Amendment

when it permitted the prosecution to introduce Detective Jacklitsch's photographs, crime scene

---

[10] Under the so-called "prison mailbox rule," *see Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001), *cert. denied*, 534 U.S. 886, a *pro se* prisoner's habeas petition is deemed "filed" on the date he gives it to prison officials for delivery to the court, *see id.*; *Houston v. Lack,* 487 U.S. 266, 270 (1988).  Where a petition does not attest to the date on which the petitioner placed his petition in the prison mailing system, courts will look to the date on which the petition is signed to determine the filing date.  *See, e.g., Costilo v. United States*, Nos. 13cv4298 (PGG) (JLC), 98cr0438 (PGG), 2012 WL 9500631, at *1 n.3 (S.D.N.Y. Nov. 12, 2012), *report and recommendation adopted by* 2016 WL 1610609 (Apr. 20, 2013); *Peralta v. Connelly*, No. 06cv5360 (DAB) (MHD), 2008 WL 8050791, at *4 n.6 (S.D.N.Y. Apr. 18, 2008), *report and recommendation adopted by* 2010 WL 3219326 (Aug. 11, 2010).  Here, the Petition is dated October 23, 2018 and contains a statement that Petitioner provided it to prison officials on that same date for mailing; accordingly, this Court deems it to have been filed as of that date.

report, and diagram, as well as Detective Brown's duplicative diagram, without producing

Detective Jacklitsch for cross-examination, and that the First Department's affirmance of this

trial court ruling was "contrary to" and constituted an "unreasonable application of" clearly

established Supreme Court precedent.[11]  (*See* Memorandum of Law in Support of 28 U.S.C.

§ 2254 Petition, dated Nov. 1, 2018 ("Pet. Mem.") (Dkt. 1-1), at 22-48.)

Starting with the language of the Appellate Division's decision, Petitioner argues that, by

holding that evidence is not testimonial (and thus not within the Confrontation Clause guarantee)

unless it "link[s] the commission of the crime to a particular person," the Appellate Division

contradicted the Supreme Court's holding in *Melendez-Diaz*, which established that the

Confrontation Clause is not limited to evidence that identifies the defendant.  (*Id.*, at 36-37.)

Petitioner further asserts that, under the Supreme Court's rulings in *Melendez-Diaz* and other

cases, the Appellate Division was required to consider whether the primary purpose of the

documents at issue was to "establish or prove past events potentially relevant to later criminal

prosecution" (*id.*, at 37 (quoting *Davis v. Washington*, 547 U.S. at 822)), and that, by instead

focusing on whether the materials at issue directly linked Petitioner to the crime, the Appellate

Division violated clearly established Supreme Court precedent, *see id.*

Had the Appellate Division applied the proper test for determining whether the evidence

was testimonial (*i.e.*, by looking to the "primary purpose" of the documents), Petitioner contends

that all of the documents and photographs that Detective Jacklitsch prepared, as well as the

duplicative diagram that Detective Brown prepared, would have "unquestionably qualified as

---

[11] As discussed below, this language ("contrary to" or an "unreasonable application of" federal law) comes from the habeas standard of review set out in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See* 28 U.S.C. § 2254(d); *see also* Discussion, *infra*, at Section 1(C).

testimonial," as their primary purpose "was use in the prosecution of a homicide, and they were created by police officers themselves." (*Id.*, at 29.)  On this point, Petitioner notes that Detective Jacklitsch's crime scene report "contained notations that the evidence was '*probative*,'" and argues that it is "hard to imagine a term more accusatory than 'probative' for evidence the police have compiled." (*Id.*, at 29-30 (noting as well that, in this case, Detective Jacklitsch's "incentive" in creating that report, as well as the diagram, was "to answer a particular question related to the issues of a particular case[] – *i.e.,* precisely what the Court held in *Melendez-Diaz* brought certificates based on laboratory reports within the Confrontation Clause's reach").)  In addition, Petitioner again asserts that, "[b]ecause everything in [Detective] Brown's diagram that implicated [Petitioner] came solely and entirely from [Detective] Jacklitsch's work, defense counsel was effectively prevented from cross-examining [Detective] Brown about the information contained in the diagram." (*Id.*, at 34.)  According to Petitioner, it was improper for the trial court to have allowed the prosecution to "insulate[]" itself "from the confrontation rules merely by having a testifying witness duplicate an inculpatory testimonial document prepared by a non-testifying witness." (*Id.*)

Going even deeper into the Supreme Court's analyses in *Melendez-Diaz* and its subsequent decision in *Bullcoming*, regarding the types of statements that would qualify as testimonial and thus be subject to the Confrontation Clause protections, Petitioner also asserts that all of the documents that Detective Jacklitsch had prepared, as well as the duplicative diagram that Detective Brown prepared, met the formality requirements of a testimonial document.  (*See id.*, at 30 (citing *Bullcoming*, 564 U.S. at 664-65).)  As argued by Petitioner:

> In *Bullcoming* and *Melendez-Diaz*, the analysts 'prepared a certificate concerning the result of his analysis' and 'formalized' the report in a 'signed document headed a 'report.'' *Bullcoming*, 564 U.S. at 664-65 (internal citations omitted); *Melendez-Diaz,*

> 552 U.S. at 808.  Here, too, the reports contain sufficiently formal elements.  Many of the pages contain the official NYPD seal, and all of Detective Jacklitsch's reports contain his badge number and the crime scene run number.  Detective Jacklitsch appeared to have used NYPD computer templates for the remaining crime scene reports (*see* Exhibits).  The 'formalities attending' the crime scene reports and diagram are thus similar to those attending the reports in *Bullcoming* and *Melendez-Diaz*.

(*Id.*)  For this reason as well, Petitioner maintains that the trial court's admission of these materials into evidence when Detective Jacklitsch was not made available for cross-examination was a violation of the Confrontation Clause, and Petitioner further argues that the court's ruling was not harmless error.  On this final point, Petitioner contends that, where there was "no forensic, surveillance, ballistics, or statement evidence [that] tied [Petitioner] to the shot that killed [] Santiago, much less even placed [Petitioner] at the scene," the Appellate Division's finding "that the crime scene reports and diagrams admitted into evidence were not harmless because they 'shed little or no light on any of the disputed issues at trial,' was unreasonable" under the AEDPA standard.  (*Id.*, at 43 (internal citation omitted).)

In opposition to the Petition, Respondent filed an attorney declaration on March 20, 2019 (*see* Stacquadanio Decl.), together with a memorandum of law (*see generally* Memorandum of Law, dated Mar. 20, 2019 ("Resp. Mem.") (Dkt. 12)), and the State Court Record and transcripts referenced above.  In its opposition, Respondent argues that the Appellate Division's decision cannot be found to have been either contrary to or an unreasonable application of Supreme Court precedent, because the Supreme Court has not specifically "addressed the question of whether a police crime scene report and diagram . . . is testimonial."  (Resp. Mem., at 10.)  Respondent goes on to argue that, even utilizing the "primary purpose" test, as set forth by the Supreme Court in *Melendez-Diaz* and *Bullcoming*, "it is evident that there was no Confrontation Clause violation here, because the crime scene report and diagram[s] at issue [were] not created for the

34

primary purpose of being a substitute for trial testimony.  Rather, they were created pursuant to

the [NYPD's] protocol in processing a crime scene."  (*Id.*, at 11.)  In squaring both its reasoning,

as well as the Appellate Division's decision, with the Supreme Court's holdings in *Melendez-*

*Diaz* and *Bullcoming*, Respondent argues:

> Contrary to [P]etitioner's contentions . . .[,] the [Appellate
> Division's] decision in this case squarely aligns with . . . *Melendez-*
> *Diaz* and *Bullcoming.*  The main worry in those cases was that the
> substituted testimony at issue – *i.e.,* the certification stating that
> seized material was cocaine and the certification stating that [the]
> defendant's blood alcohol content was above the legal limit,
> respectively – were *per se* evidence of the defendants' culpability.
> This type of direct evidence established the elements of those
> crimes, which were required to be proved.  Put differently, the
> contents of those reports could be 'nothing but testimonial' since
> they 'directly linked the accused to the charged crimes.'  *See*
> *People v. Pealer*, 20 N.Y.3d 447, 454 (2013).   Here, on the other
> hand, the ballistic evidence that was recovered from the scene
> was circumstantial evidence, from which the elements of
> manslaughter – and [Petitioner's] involvement in it – could be
> inferred.

(*Id.*, at 14.)

Finally, Respondent maintains (for the reasons stated in the People's appellate briefing)

that any error in admitting either Detective Jacklitsch's documents or Detective Brown's

duplicative diagram was harmless.  (*See id.*, at 16-17.)

Petitioner filed a reply brief on April 15, 2019 (*see* Reply Memorandum of Law in

Support of 28 U.S.C. § 2254, dated Apr. 15, 2019 ("Pet. Reply Mem.") (Dkt. 14)), arguing two

points:  First, that Respondent had misconstrued both the nature of the "primary purpose" test

and the AEDPA standard of review; and, second, that the admission of testimonial evidence that

was not subject to cross-examination was not harmless, as it had a "substantial and injurious

effect on the outcome of the case" (*id.*, at 1-9).

D.   **The Parties' Supplemental Submissions Regarding *Garlick v. Lee***

On June 3, 2020, Petitioner, through counsel, submitted a letter to this Court, writing to

"call the Court's attention to supplemental authority relevant to this case."  (Letter to the Court

from Katharine Skolnick, Esq., dated June 3, 2020 ("Skolnick 6/3/20 Ltr.") (Dkt. 15), at 1.)  In

particular, Petitioner informed the Court that, one day earlier, then-Chief Judge Colleen

McMahon had issued an order granting a petition for a writ of habeas corpus, finding that the

Appellate Division, First Department, had issued a decision in another criminal case, *People v.*

*Garlick*, 144 A.D.3d 605 (1st Dep't 2016), that had "unreasonably applied clearly established

[Supreme Court] law" on the Confrontation Clause.  (*Id.*, at 1 (quoting *Garlick v. Lee*, 464

F. Supp. 3d 611, 618 (S.D.N.Y. 2020) (adopting in part, rejecting in part, report and

recommendation).)  Petitioner pointed out that, just as it had in his case, the Appellate Division

in *Garlick* had "found there [was] a 'suspect-identity' requirement for the Confrontation Clause

to apply," which Judge McMahon, in turn, concluded was an error that departed from clearly

established Supreme Court law.  (*Id.*)  In highlighting Judge McMahon's reasoning and its

persuasive value here, Petitioner's counsel wrote:

> To prevail, Garlick did not have to show that there was a Supreme
> Court case involving an autopsy report – *i.e.,* an identical fact
> pattern – but simply Supreme Court law holding that a report
> 'prepared in the course of a criminal investigation and tending to
> prove the victim's cause and manner of death' is testimonial.
> Mr. Garlick had done just that.  Therefore, as Judge McMahon
> correctly found, having a surrogate witness testify about
> information in a testimonial document violated Garlick's
> constitutional rights.  So, too, must this Court find in [Petitioner's]
> case.

(*Id.*)

On June 9, 2020, Respondent filed a letter in opposition (*see* Letter to the Court from

Marianne Stracquadanio, Esq., dated June 8, 2020 ("Stracquadanio 6/8/20 Ltr.") (Dkt. 16)),

arguing that (1) *Garlick* was inapplicable, as it "pertain[ed] to a different type of evidence (autopsy reports)"[12] and, in contrast, the crime scene report and diagrams at issue here did not contain testimonial "statements," as "they merely mapped out the ballistic evidence that was collected at the location of the shooting"; and (2) in any event, Judge McMahon's holding in *Garlick* was erroneous in finding that the Appellate Division's decision had been an unreasonable application of "clearly established" Supreme Court precedent, where, according to Respondent, the Supreme Court had not "clearly established . . . that an autopsy report [was] testimonial" (*id.*, at 1).  Respondent indicated that it intended to appeal the *Garlick* decision and requested that this Court reserve decision until the appeal was resolved.  (*Id.*, at 2.)

On June 15, 2021, Petitioner's counsel submitted a second letter to this Court, seeking to draw its attention to the Second Circuit's decision in *Garlick*, affirming the District Court's order.  (*See* Letter to the Court from Katharine Skolnick, Esq., dated June 15, 2021 ("Skolnick 6/15/21 Ltr.") (Dkt. 17), at 1-2 (citing *Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021).)  As noted by Petitioner, the Second Circuit agreed with Judge McMahon that the Appellate Division had erred in finding that evidence is only testimonial if it links a particular suspect to a crime.  (*See id.*, at 1.)  As explained by Petitioner, the Second Circuit in *Garlick* held "that a report of an autopsy, which 'was performed in aid of an active police investigation,' was testimonial and could be introduced only through a witness subject to confrontation."  (*Id.* (quoting *Garlick*, 1 F.4th at

---

[12] It is notable that Respondent, in opposition to Petitioner's supplemental letter, took the position that the *Garlick* case was inapplicable because it involved an autopsy report, where, as noted above (*see* Background, *supra*, Section B(3)(b)), the People, in arguing before the Appellate Division in this case, specifically contended that "the crime scene report and diagram [at issue were] similar to autopsy reports" in that each involved "information gathering and reporting."  (Resp. App. Br., at 22 (noting that an autopsy report includes statements as to "what happened to the victim" while the crime scene report and diagram at issue included statements as to "what was found at the scene").

133).)  Given this Circuit precedent, Petitioner's counsel concluded:  "The Second Circuit's decision [in *Garlick*] leads to the inexorable conclusion that [Petitioner's] right to confrontation was also violated when several police-created documents were introduced through a surrogate witness instead of the detective who had created them."  (*Id.*)[13]

On February 25, 2022, this Court received a third letter from Petitioner's counsel, informing it that the Supreme Court had denied the People's application for a writ of certiorari in *Garlick*.  (*See* Letter to the Court from Katharine Skolnick, Esq., dated Feb. 25, 2022 ("Skolnick 2/25/22 Ltr.") (Dkt. 18), at 1 (citing *Garlick v. Lee*, 2022 WL 516386, No. 21-637 (Feb. 22, 2022)).)

## DISCUSSION

### I.   APPLICABLE LEGAL STANDARDS

#### A.   Statute of Limitations

Under AEDPA, a habeas petition must be filed within one year of the latest of four dates specified by statute, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."[14]  28 U.S.C. § 2244(d)(1)(A); *see also Williams v. Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in

---

[13] After this Court received the Skolnick 6/15/21 Ltr., its Chambers attempted, on two occasions, to contact the Bronx District Attorney's Office to ascertain whether Respondent intended to respond.  To date, this Court has received no response from Respondent's counsel.

[14] The limitations period may alternatively begin to run on the following dates:  (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(B)-(D).

the state court system and either the completion of certiorari proceedings in the United States

Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of]

the time to seek direct review via certiorari"). The limitations period is tolled during the

pendency of any "properly filed application for State post-conviction or other collateral review

with respect to the pertinent judgment or claim." 28 U.S.C. § 2244(d)(2).

### B.    Exhaustion of State Remedies

As a general matter, a federal court may not consider a petition for a writ of habeas

corpus unless the petitioner has exhausted all state judicial remedies for his federal claims.

28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Picard v. Connor*,

404 U.S. 270, 275 (1971) (exhaustion requirement, as now codified in AEDPA, "reflects a policy

of federal-state comity"); *Rhines v. Weber*, 544 U.S. 269, 273-74 (2005) ("the interests of comity

and federalism dictate that state courts must have the first opportunity to decide a petitioner's

claims" (citation omitted)).

To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented"

his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and

correct' alleged violations of . . . prisoners' federal rights." *Picard*, 404 U.S. at 275 (quoting

*Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)). A petitioner may fairly present a federal

claim in several ways, including by citing relevant provisions of the federal Constitution in his

appellate brief, *see Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001), or by relying on "pertinent

federal cases employing constitutional analysis" or "state cases employing constitutional analysis

in like fact situations," *see Mallet v. Miller,* 432 F. Supp. 2d 366, 374 (S.D.N.Y. 2006)

(enumerating the ways a petitioner may fairly present his federal claims in state court).

Aside from setting out the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the pertinent state." *Chebere v. Phillips*, No. 04cv296 (LAP), 2013 WL 5273796, at *19 (S.D.N.Y. Sept. 18, 2013) (quoting *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994)).  In New York, for a claim that can be raised on direct appeal, a petitioner must first appeal his conviction to the Appellate Division and then seek "further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005).

C.    **Standard of Review**

When this Court reviews a federal constitutional claim that has been adjudicated on the merits by the state court, the Court must accord substantial deference to the state court's decision under the standard of review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).[15]

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced." *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003). The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams v. Taylor*, 529 U.S. at 409). In order to be entitled to habeas relief on this basis, the petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

The relevant date for determining applicable "clearly established Supreme Court law" is the date of the last state court adjudication of the petitioner's claim "on the merits." *Greene v. Fisher*, 565 U.S. 34, 40 (2011).

---

[15] In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

II.     **THE PETITION SHOULD BE GRANTED.**

A.     **Timeliness of the Petition**

As a preliminary matter, this Court notes that there is no issue as to whether Petitioner

filed his federal habeas Petition within the one-year statute of limitations provided by AEDPA.

On August 24, 2017, the Court of Appeals denied Petitioner's request for leave to appeal the

Appellate Division's affirmance of his conviction and sentence, *see Diaz*, 86 N.E.3d at 567.  For

purposes of the AEDPA statute of limitations, his conviction became final 90 days thereafter,

*i.e.*, on November 22, 2017, when his time to petition for certiorari expired, *see Williams v.

Artuz*, 237 F.3d at 150-51.  As noted above, the Petition was signed and dated as having been

turned over to prison officials for mailing on October 23, 2018, within the one-year limitations

period.  (*See* Pet.)

B.     **Exhaustion**

On the issue of exhaustion, this Court notes that, in his habeas submission, Petitioner has

raised a Confrontation Clause claim that largely mirrors the claim that he raised on his direct

appeal – *i.e.,* that the trial court's admission of the documents prepared by Detective Jacklitsch

(photographs, crime scene report, and diagram), as well as the admission of Detective Brown's

duplicative diagram, violated his federal constitutional rights, as he was not afforded an

opportunity to cross-examine Detective Jacklitsch at trial.  (*See* Pet. Mem., at 26-49; *see also* Pet.

App. Br., at 45-59.)  Before each level of the state courts, Petitioner consistently raised this

argument in federal constitutional terms, citing not only the Sixth Amendment, but also Supreme

Court precedent in *Crawford*, *Davis*, *Melendez-Diaz*, and *Bullcoming*, all of which discuss the

types of "testimonial" statements that fall within the confines of the Confrontation Clause.  (*See*

Trial Tr., at 89; Pet. App. Br., at 45-59; Goldberg 7/24/17 Ltr., at 6-10; Pet. ¶ 9(g)(6).)

Accordingly, Petitioner's single, squarely presented claim in his habeas Petition has been fully exhausted.

### C.   Confrontation Clause Claim

As Petitioner's Confrontation Clause claim was decided on the merits by the Appellate Division (in the last reasoned opinion of the state courts), the claim is now reviewable under the AEDPA standard of review.  *See* 28 U.S.C. § 2254(d).  Under that standard, Petitioner argues that the Appellate Division's decision was "contrary to" and constituted an "unreasonable application" of clearly established federal law, as determined by the Supreme Court.

### 1.   Legal Framework

In *Crawford*, the Supreme Court ruled that the Confrontation Clause prohibits the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54 (emphasis added).[16]  The Supreme Court's modern Confrontation Clause jurisprudence has not set forth an exhaustive list of the type of evidence that would qualify as "testimonial" (such that it would give rise to the criminal defendant's right of cross-examination), but, starting with *Crawford*, the Court *has* provided parameters and guidance to enable lower courts to make this determination.  As noted above (*see* Background, *supra*, at Section D), in June 2021, the Second Circuit, in *Garlick*, considered a Confrontation Clause claim similar, in many respects, to the one raised here.  Before reaching its decision in that case,

---

[16] In this case, the prosecution never demonstrated that Detective Jacklitsch was unavailable to testify, and, in any event, the record provides no indication that he was ever previously subjected to cross-examination regarding his crime scene report and diagram.  Hence, if the statements in the documents that he prepared are properly characterized as "testimonial," then his non-appearance at trial rendered the admission of those statements violative of Petitioner's Confrontation Clause rights.

the Circuit discussed the evolution of Supreme Court law on the question of what would

constitute "testimonial" evidence, and provided a comprehensive description of the applicable

holdings of *Crawford*, *Melendez-Diaz*, *Bullcoming,* and *Williams v. Illinois*, 567 U.S. 50 (2012).

Although this Court would not ordinarily reproduce a large portion of another court's opinion

within its own report and recommendation, it finds it appropriate to make an exception here,

where the same Supreme Court precedent is relevant to Petitioner's claim, and where the

Circuit's decision in *Garlick* presents such a thorough and helpful synthesis of Supreme Court

law.  Accordingly, and for ease of reference, the following legal-background section of the

Second Circuit's decision in *Garlick* is quoted in its entirety:

## A

In *Crawford v. Washington*, the Supreme Court considered whether the defendant's wife's tape-recorded statement to police could be entered into evidence even though the wife was exempt from cross-examination by the marital privilege.  541 U.S. 36, 40 (2004).  The Court held that regardless of its "indicia of reliability," a testimonial statement such as the tape recording is inadmissible without an opportunity for cross-examination of the declarant.  *Id.* at 68-69. The Court noted "[v]arious formulations" for defining the "core class of 'testimonial' statements":

• "*ex parte* in-court testimony or its functional equivalent— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,"

• "extrajudicial statements contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and

• "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."

*Id.* at 51-52 (alterations and citations omitted).  The Court explained that "[s]tatements taken by police officers in the course of

interrogations are also testimonial under even a narrow standard," *id*. at 52, and therefore the Confrontation Clause would not allow the admission of the tape recording absent "unavailability [of the declarant] and a prior opportunity for cross-examination," *id.* at 68. The reliability of a testimonial statement may be determined only "by testing in the crucible of cross-examination." *Id.* at 61.

## B

The Supreme Court applied this holding to forensic reports in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), in which the Court concluded that certificates attesting to the laboratory analysis of a suspected controlled substance fell "within the core class of testimonial statements" that required an opportunity for cross-examination. *Id.* at 310.

*In Melendez-Diaz*, the defendant objected to the trial court's admission into evidence of three certificates that confirmed that the substance seized from his person was cocaine. *Id.* at 308-09. The defendant argued that because he had no opportunity to confront the analysts who performed the forensic tests, the admission violated his Sixth Amendment right of confrontation. *Id.* at 309. The Supreme Court agreed. *Id*. at 329.

The Court explained that the certificates were "quite plainly affidavits"; the certificates were "sworn to by the declarant before an officer authorized to administer oaths" and thus "incontrovertibly" amounted to a "'solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 310 (quoting *Crawford*, 541 U.S. at 51). The Court further noted that the certificates were "functionally identical to live, in-court testimony, doing precisely what a witness does on direct examination." *Id.* at 310-11 (internal quotation marks omitted). And the certificates were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," especially because "under Massachusetts law the sole purpose of the affidavits was to provide prima facie evidence of the composition, quality, and the net weight of the analyzed substance." *Id*. at 311 (internal quotation marks and citation omitted). For these reasons, "[a]bsent a showing that the analysts were unavailable to testify at trial and that [*Melendez-Diaz*] had a prior opportunity to cross-examine them," the certificates were inadmissible without an opportunity to cross-examine the analysts who prepared those documents. *Id.*

45

The Court addressed several arguments advanced by the State in favor of admissibility.  First, the Court rejected the argument that the analysts who prepared the certificates were not subject to confrontation "because they are not 'accusatory' witnesses, in that they do not directly accuse petitioner of wrongdoing" and their "testimony is inculpatory only when taken together with other evidence linking petitioner to the contraband." *Id.* at 313.  The Court explained that "the analysts were witnesses" and "provided testimony against petitioner, proving one fact necessary for his conviction—that the substance he possessed was cocaine." *Id.* There is no category of witnesses who are "helpful to the prosecution" but "somehow immune from confrontation." *Id.* at 314.

Second, the Court rejected the argument that scientific reports should be admissible based on indicia of reliability. *Id.* at 318.  The Court explained that even statements which result from purportedly "neutral scientific testing" must be subject to cross-examination because such tests are not necessarily "as neutral or as reliable" as advertised and are not "uniquely immune from the risk of manipulation." *Id.*  Because confrontation "is designed to weed out not only the fraudulent analyst, but the incompetent one as well . . . an analyst's lack of proper training or deficiency in judgment may be disclosed in cross-examination" and may reveal the "[s]erious deficiencies [that] have been found in the forensic evidence used in criminal trials." *Id.* at 319-20.  Even scientific testing and expert analysis rely on subjective judgments about which tests to perform and how to interpret the results. *See id.* at 320.  The exercise of such judgment "presents a risk of error that might be explored on cross-examination." *Id.*  The Court said this is "true of many of the other types of forensic evidence commonly used in criminal prosecutions" because there is "wide variability across forensic science disciplines with regard to techniques, methodologies, reliability, types and numbers of potential errors, research, general acceptability, and published material." *Id.* at 320-21.

Third, the Court rejected the argument that the Confrontation Clause allows an exception for public or business records. *Id.* at 321. While a document kept in the regular course of business ordinarily may be admitted at trial despite its hearsay status, such a document may not be admitted without confrontation if "the regularly conducted business activity is the production of evidence for use at trial." *Id.* Similarly, public records are generally admissible unless such records reflect "matters observed by police officers and other law-enforcement personnel" in criminal cases. *Id.* at 322 (quoting Fed. R. of Evid. 803(8)). Accordingly, testimonial statements cannot be

admitted into evidence as business or public records without confrontation. *Id.* at 324.

**C**

In *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), the Court reaffirmed that forensic reports — even those prepared by analysts who purportedly act as "mere scrivener[s]" of machine-generated results— are testimonial statements that are inadmissible without confrontation. *Id.* at 659. The defendant was arrested on charges of driving while intoxicated, and the principal evidence against him was a laboratory report certifying that his blood-alcohol concentration was above the legal limit. *Id.* at 651. The trial court admitted the report through a surrogate witness on the ground that the analyst who prepared the report "'was a mere scrivener,' who 'simply transcribed the results generated by the gas chromatograph machine.'" *Id*. at 657.

The Supreme Court disagreed, holding that "[i]n all material respects, the laboratory report in this case resembles those in *Melendez-Diaz*." *Id.* at 664. "[A]s in *Melendez-Diaz*, a law-enforcement officer provided seized evidence to a state laboratory required by law to assist in police investigations," and in both cases an analyst "tested the evidence and prepared a certificate concerning the result of his analysis" that was "'formalized' in a signed document" and thus was an affirmation "made for the purpose of establishing or proving some fact in a criminal proceeding." *Id.* at 664-65 (internal quotation marks omitted). The Court found it "[n]oteworthy" that the laboratory report contained a legend to aid law enforcement in the admission of certified blood-alcohol analyses in municipal and magistrate courts, making clear that the report would be available for use at a later trial. *Id.* at 665; *see also Melendez-Diaz*, 557 U.S. at 311; *Crawford*, 541 U.S. at 50-52.

Again, the Court addressed several counter-arguments for admitting the report without confrontation. First, the Court rejected the argument that the laboratory report was merely the number resulting from the blood alcohol test "scrivened" by the analyst; rather, the analyst who signed the report certified that he had received the sample intact, had checked that the sample corresponded to the correct report number, and had performed a particular test following a specified protocol. *Bullcoming*, 564 U.S. at 660. The testimony of a surrogate witness could not convey what the analyst who conducted the test "knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed," and could not "expose any lapses or lies on the

certifying analyst's part." *Id.* at 661-62. Moreover, the report allowed the analyst to identify any "circumstance or condition" that "affected the integrity of the sample or the validity of the analysis." *Id.* at 660 (alterations omitted). Representations relating to the presence or absence of such circumstances relate "to past events and human actions not revealed in raw, machine-produced data" and are "meet for cross-examination." *Id.*

Second, the Court rejected the argument that forensic reports that are purely observational and that do not accuse the defendant of wrongdoing are nontestimonial and therefore not subject to confrontation. The Court explained that *Melendez-Diaz* clarified that a document created "for an evidentiary purpose," and "made in aid of a police investigation," is testimonial. *Id.* at 664 (internal quotation marks omitted). Thus, even "observations of an independent scientist made according to a non-adversarial public duty" are testimonial if made in aid of a police investigation or if it were reasonably known that the observations would be available for use at a later trial. *Id.* (internal quotation marks and alteration omitted).

Third, the Court held that the absence of notarization does not change the report's testimonial status. Otherwise, the right to confrontation would become "easily erasable" because distinguishing between reports that are notarized and those that are not would "render inadmissible only sworn *ex parte* affidavits, while leaving admission of formal, but unsworn statements, 'perfectly OK.'" *Id.* (quoting *Crawford*, 541 U.S. at 52 n.3).

## D

In a later decision in which no opinion had the support of a majority of the Court, the Supreme Court considered whether "[o]ut-of-court statements that are related by [a testifying] expert solely for the purpose of explaining the assumptions on which [the expert's] opinion rests" are subject to the restrictions of the Confrontation Clause. *Williams v. Illinois*, 567 U.S. 50, 58 (2012) (plurality opinion). In *Williams*, a forensic expert testified at a bench trial that a DNA profile—prepared by an outside laboratory with evidence taken from the victim's body—matched another DNA profile produced by the state police from the defendant's blood. *Id.* at 56. A plurality of the Court concluded that the DNA profile prepared by the outside laboratory was not offered for its truth and therefore was not a testimonial statement subject to the Confrontation Clause. *Id.* at 57-58. The plurality reasoned that in a bench trial the judge sits as the trier of fact and will presumably "understand the limited

reason for the disclosure of the underlying inadmissible information and will not rely on that information for any improper purpose." *Id*. at 69. The Court affirmed the judgment of the trial court admitting the testimony.

The plurality suggested that even if the underlying profile had been admitted for its truth, evidence that does not serve the primary purpose of accusing a targeted individual of wrongdoing is not testimonial. *Id*. at 84-86. But five justices disagreed, noting that *Melendez-Diaz* held that the Sixth Amendment contemplates only "two classes of witnesses—those against the defendant and those in his favor," *id*. at 116 (Thomas, J., concurring in the judgment) (quoting *Melendez-Diaz*, 557 U.S. at 313), and that prior cases had not held that a testimonial statement "must be meant to accuse a previously identified individual; indeed, in *Melendez-Diaz*, we rejected a related argument that laboratory analysts are not subject to confrontation because they are not 'accusatory' witnesses," *id*. at 135 (Kagan, J., dissenting) (internal quotation marks omitted).

The plurality also suggested that the match provided "strong circumstantial evidence" that the outside laboratory's analysis was reliable and not the product of "shoddy or dishonest work." *Id*. at 76-77 (plurality opinion). But five justices objected that such evidence of reliability did not render the outside laboratory's profile admissible. *See id*. at 109 (Thomas, J., concurring in the judgment) ("The existence of other evidence corroborating the basis testimony . . . does not change the purpose of such testimony and thereby place it outside of the reach of the Confrontation Clause."); *id*. at 138 (Kagan, J., dissenting) ("It is not up to us to decide, ex ante, what evidence is trustworthy and what is not.").

Justice Thomas, concurring in the judgment, disagreed with the plurality's conclusion that the report was admissible because it was not offered for its truth. *Id*. at 106. Rather, he reasoned that the DNA profile was "not a statement by a witness within the meaning of the Confrontation Clause" because it lacked "the solemnity of an affidavit or deposition." *Id*. at 111 (internal quotation marks and alteration omitted). Justice Thomas concluded that the profile could be admitted because it was "neither a sworn nor a certified declaration of fact" and it did not "attest that its statements accurately reflect the DNA testing processes used or the results obtained." *Id*. No other justices embraced this reasoning.

Ordinarily, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those

Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted). That rule produces no clear answer here because neither the plurality's nor Justice Thomas's rationale is necessarily narrower than the other. We have previously concluded that "*Williams* does not . . . yield a single, useful holding relevant to the case before us." *United States v. James*, 712 F.3d 79, 95 (2d Cir. 2013). That is the case here, and we therefore rely on Supreme Court precedent predating *Williams*. *Id*. at 4.

*Garlick*, 1 F.4th at 129-33.[17]

### 2. The Appellate Division's Decision Was Not "Contrary to" Clearly Established Federal Law, as Established by the Applicable Supreme Court Precedent.

To the extent the Petition can be interpreted as raising an argument that the Appellate Division's decision "was contrary to" clearly established federal law, as determined by the Supreme Court (*see* Pet. Mem., at 26; *see also* 28 U.S.C. § 2254(d)(1)), this Court finds that argument unpersuasive. Under AEDPA, a state court decision will only be considered contrary to Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confront[s] a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and arrives at a different result from [that] precedent." *Williams v. Taylor*, 529 U.S. at 405-06. Neither circumstance is present here. First, the Appellate Division located the correct rule: Out-of-court statements are only subject to confrontation to the extent that they are testimonial. Second, although falling under the same legal rule that was

---

[17] In its recitation of the Supreme Court's Confrontation Clause guidance, the Second Circuit in *Garlick* did not address *Davis* (cited in Pet. Mem., at 32), a decision that was issued by the Supreme Court after *Crawford* but before *Melendez-Diaz*, *Bullcoming*, and *Williams*. The central holding of *Davis* is not directly applicable here, as the Court held that hearsay statements made in a 911 call asking for aid were not "testimonial" in nature and thus their introduction at trial did not violate the Confrontation Clause, *see* 547 U.S. at 822; it is plain, from the record before this Court that there was no "ongoing emergency" at the time Detective Jacklitsch prepared his crime scene report and diagram.

addressed in *Crawford*, *Melendez-Diaz*, and *Bullcoming* (a rule discussed and analyzed in greater detail below), the factual circumstances giving rise to the out-of-court statements at issue in this case are not "materially indistinguishable" from those underlying the statements considered by the Supreme Court in those cases.

Thus, because the Appellate Division identified the correct rule and applied it to facts distinguishable from the Supreme Court's prior decisions, the Appellate Division's decision was not "contrary to" Supreme Court precedent.   Accordingly, I do not recommend granting habeas relief on this basis.

### 3.   The Appellate Division's Decision *Did* Represent an Unreasonable Application of Clearly Established Federal Law.

On the other hand, this Court finds that the Appellate Division's decision, which was the last reasoned state-court adjudication of Petitioner's claim, constituted an "unreasonable application of" clearly established federal law, within the meaning of Section 2254(d)(1) of AEDPA, and that Petitioner is entitled to relief on that ground.

### a.   The Trial Court Erroneously Admitted Testimonial Evidence Without Affording Petitioner the Opportunity For Cross-Examination, in Violation of the Confrontation Clause.

As an initial matter, contrary to Respondent's contention (*see* Resp. Mem., at 10), Petitioner is not required to identify a Supreme Court opinion holding that a police investigator's crime scene report and diagram (such as those specifically at issue here) are testimonial in nature, in order to prevail on a claim that "clearly established law" mandated a different result in this case.  The "unreasonable application" prong of the federal habeas statute does not demand "an identical factual pattern before a legal rule must be applied."  *White v. Woodall*, 572 U.S. 415, 427 (2014).   Rather, as long as the Supreme Court has clearly set out a legal rule for when the Confrontation Clause will be considered violated, and has both explained the parameters of

that rule and provided guidance for its application, the proper question before this Court is
whether the state court's application of that rule was unreasonable, on the facts presented.  In this
case, accepting as "clearly established" the Supreme Court rule first set out in *Crawford*, that a
criminal defendant must be given an opportunity to cross-examine when the evidence presented
against him is "testimonial," and considering the guidance that has been provided by the
Supreme Court with respect to determining whether a statement should, in fact, be considered
testimonial, this Court concludes that Petitioner was denied his constitutional right to cross
examine Detective Jacklitsch regarding both his crime scene report and ballistics diagram, as
well as Detective Brown's duplicative diagram, the substance of which was entirely derived from
Detective Jacklitsch's work.[18]

To start, this Court again notes that the circumstances presented here are similar, in many
respects, to those presented in *Garlick*.  As discussed above (*see* Background, *supra*, at
Section D), the Second Circuit, in *Garlick*, held that an autopsy report, which "was performed in
aid of an active police investigation," was testimonial and could be introduced only through a
witness subject to confrontation.  *See Garlick*, 1 F.4th at 134.  In reaching that conclusion, the
Second Circuit analyzed the autopsy report at issue by considering the various factors that had
been highlighted by the Supreme Court in its Confrontation Clause cases.  In *Garlick*, those

---

[18] With respect to Detective Jacklitsch's photographs, it appears that Petitioner – in
crafting his Confrontation Clause claim – has grouped those materials with the crime scene
report and diagrams because thumbnail copies of the photographs were included within the crime
scene report.  (*See* App'x, at A1686-1700.)  In his memorandum of law in support of the
Petition, Petitioner principally focuses his argument on the trial court's purportedly improper
"admission into evidence of the crime scene report or the diagram[s]," as he argues that those
documents contained testimonial statements, which needed to be subject to cross-examination.
(Pet. Mem., at 26.)  This Court does not construe Petitioner's submissions as making the same
argument with respect to the photographs, standing alone, and thus will not consider any such
argument here.

factors – including that the autopsy had been performed in aid of an active police investigation and that the circumstances under which the report were created would have led any objective witness to believe that it would be available for use in a later prosecution; that the report was formalized in a signed document; and that the report had been used extensively at trial for the purpose of proving key facts – all weighed in favor of concluding that the autopsy report was "testimonial." *See id.*, at 133-36.  Tracking the Second Circuit's reasoning here, this Court likewise finds that the crime scene report and two diagrams that were placed in evidence at Petitioner's trial constituted testimonial evidence that could only have been introduced through the testimony of their original creator, Detective Jacklitsch.

First, this Court looks to whether the documents at issue were created "in aid of a police investigation" and had an "evidentiary purpose." *Bullcoming*, 564 U.S. at 664.  In this case, there is little question that Detective Jacklitsch, as the assigned lead crime scene investigator, created his crime scene report, as well as his ballistics diagram, in aid of the police investigation of the shootout, and with an anticipated evidentiary purpose.  Indeed, on September 22, 2009, Detective Jacklitsch reported to the scene only two hours after the shootout (*see* App'x, at A1715), and his identification of the ballistics evidence, as well as his measurements and efforts to retrieve such evidence, were all part of the ongoing criminal investigation in which information was being shared among officers and suspects were being identified.  The timeline indicates that, at the same time he was gathering evidence at the scene, Pena (one of the shooting victims) was identifying Petitioner as a suspect to Detective O'Neil, another investigator assigned to the case.  (*See* Pretrial Tr., at 139-40.)  Also, many of the documents contained in Detective Jacklitsch's crime scene report were date- and time-stamped September 23, 2009 (*see, e.g.,* App'x, at A1715, A1726), and, on that same date, Petitioner was identified in a lineup by

Soto and then formally arrested on charges relating to the shootout (*see* Trial Tr., at 270-73). Further, at least a few of the pages contained in Detective Jacklitsch's crime scene report appear to have been completed on October 9, 2009, by which time Petitioner had been indicted.  (*See, e.g.,* App'x, at A1724, A1727 (listing "report date" as "October 9, 2009").)  The circumstances under which Detective Jacklitsch's crime scene report and diagram were created would thus lead any objective witness to "believe that [those documents] would be available for use at a later trial," *Crawford*, 541 U.S. at 52 (internal quotation marks and citation omitted); *Melendez-Diaz*, 557 U.S. at 310; *Bullcoming*, 564 U.S. at 664, and to expect that the statements contained therein would be used in a criminal prosecution, *see Crawford*, 541 U.S. at 51-52; *Melendez-Diaz*, 557 U.S. at 310.

Second, this Court considers the level of "formality" of the documents at issue.  *See Bullcoming*, 564 U.S. at 671 (Sotomayor, J., concurring in part) (noting that, while "[f]ormality is not the sole touchstone of our primary purpose inquiry, a statement's formality or informality can shed light on whether a particular statement has a primary purpose of use at trial" (internal quotation marks and citation omitted)).  In this instance, Detective Jacklitsch's crime scene report and diagram bear multiple indications that his findings were "formalized" in those documents.  The statements made by Detective Jacklitsch were apparently prepared in a systematic and careful fashion, and consistently referenced a "crime scene run number," which, according to Detective Brown, was "unique only for that particular job."  (Trial Tr., at 678.) Each of the documents that Detective Jacklitsch prepared also listed the specific crimes that he was investigating, *i.e.,* "homicide and a felonious assault."  (*Id.*, at 679.)  Most notably, Detective Jacklitsch included his name and put his shield number on each of the documents (*see id.*), and many pages of the crime scene report contain the official NYPD seal as well as headers that

54

identify the document as a "Crime Scene Unit Report" (*see* App'x, at A1715-27; *see also* App'x, at A1729 (Jacklitsch diagram, which contains the creator's name and badge number, the crime scene run number, the precinct number, the crimes being investigated, and the date)).  Such indicia of formality can suggest that a statement is testimonial.  *See Bullcoming*, 564 U.S. at 664-65 (pointing to formal quality of a document headed a "report" and signed, and noting that "[t]he absence of notarization would not remove [a] certification from Confrontation Clause governance").

Third, a statement is more likely testimonial when it effectively provides testimony against the defendant, and tends to "prov[e] [a] fact necessary for his conviction." *Melendez-Diaz*, 557 U.S. at 314.  This fact, too, is suggestive of the testimonial quality of the crime scene report and diagrams, as the statements contained in those documents were used, at Petitioner's trial, to support the prosecution's theory of Petitioner's culpability for the death of Santiago.  During the investigation, Detective Jacklitsch gave each piece of ballistics evidence a number from one to 25; he added the evidence to the diagram using small directional line markers; he included descriptions and indicated where he found each piece of evidence; he indicated what he believed each piece of evidence to be; and he added measurements throughout the diagram.  (*See* App'x, at A1684-1727, A1729.)  Of particular significance, Detective Jacklitsch labeled his very first entry in the section of his crime scene report focused on the collected "evidence" as "J1"; he wrote that he believed J1 was a casing from a "Winchester 45 auto"; he added that it was of "probative" value; and he included measurements showing where he found it in relation to Willis Avenue.  (*See id.*, at A1702.)

As reflected by the trial transcript, this was critical factual evidence in the People's case-in-chief.  (*See, e.g.,* Trial Tr., at 947-50.)  The transcript reflects that Detective Jacklitsch's crime

scene report and diagram, as well as Detective Brown's duplicative diagram, were used extensively to prove the location of the individual who allegedly shot Santiago, and to support that it was Petitioner who was that individual, rather than any other shooter, such as Ewell (who admitted to having used a gun in self-defense) or Vargas (who was also charged with having used a gun during the subject incident). *See Bullcoming*, 564 U.S. at 655-66 (noting how the testimonial statement (a forensic report) concerning the defendant's blood alcohol level had "supported a prosecution for aggravated DWI").  Further, the prosecution used the information contained in, or derived from, Detective Jacklitsch's crime scene report and diagram (1) in its questioning of key eyewitnesses (*see* Trial Tr., at 254-56, 431, 457, 530-32, 623-24, 637-39, 644-45, 751-52); (2) in aiding the jury upon a visit to the scene (*see id.*, at 767-70); and (3) in framing its closing statement, in which it described the scene in presenting its arguments as to why Petitioner should be found guilty of the charges against him (*see id.*, at 947-50).  *See Crawford*, 541 U.S. at 40-41 (noting how the prosecution had relied on the testimonial statement at issue and, in closing, described it as "damning evidence").  The fact that, during its deliberations, the jury twice asked to review Detective Brown's diagram – which Detective Brown admitted was intended to be a "duplicate" of Detective Jacklitsch's original diagram – drives home just how central to the prosecution's case this evidence was.  (*See* App'x, at A25, A28.)

Overall, it is abundantly apparent that the statements contained within Detective Jacklitsch's crime scene report and diagram constituted "an out-of-court substitute for trial testimony," *Bullcoming*, 564 U.S. at 669 (Sotomayor, J., concurring in part) (internal quotation marks and citation omitted), regarding, in this instance, the location of ballistics evidence and the

likely direction of its travel, posing a "risk of error" that could not be explored through cross-examination," *Melendez-Diaz*, 557 U.S. at 320.

Ultimately, although Detective Brown prepared his own diagram and was available to testify at the trial, those efforts could not have served as a a sufficient substitute for Detective Jacklitsch's testimony.  As Detective Brown noted throughout the trial, it was his goal to "duplicate" Detective Jacklitsch's diagram, so as to show where *Detective Jacklitsch* had recovered evidence, in order to present *Detective Jacklitsch's* findings at Petitioner's trial.  (Trial Tr., at 107.)  Detective Brown essentially testified that he deduced where to place all 25 pieces of evidence in the diagram from "looking at Detective Jacklitsch's diagram and taking measurements from his diagram" and by looking at Detective Jacklitsch's photographs.  (*Id.*, at 107, 143.)  In fact, as the testimony reveals, all of the "pieces of evidence" in Detective Brown's diagram were "lifted directly from [Detective] Jacklitsch's diagram."  (*Id.*, at 143.)   As Detective Brown did not supervise, participate in, or observe Detective Jacklitsch's collection and assessment of the evidence, or the creation of his report and diagram, Detective Brown could not have been meaningfully cross-examined regarding any potential flaws in Detective Jacklisch's crime scene investigation or in his deductions.

On this point, it is important to note, as Petitioner rightly argues, that there appears to have been some level of interpretive and deliberative work reflected in Detective Jacklitsch's documents, especially where the word "probative" was used.  Detective Brown even testified that the crime scene report and diagram required skill and interpretive acumen to produce.  (*See id*, at 57-62.)  Detective Brown's testimony strongly suggested that the creation of Detective Jacklisch's report and diagram required specialized training and adherence to a "precise protocol."  *Bullcoming*, 564 U.S. at 660.  Where Detective Brown did no independent

analysis and was not in a position to agree or disagree with Detective Jacklitsch's findings, the prosecution should have been required to introduce Detective Jacklitsch's crime scene report and diagram through the person who actually created them, in order to provide the defense with a fair opportunity to cross-examine him regarding not only the information and interpretive data, but also his "proficiency, the care he took in performing his work, and his veracity." *Bullcoming*, 564 U.S. at 661 n.7.

Had Petitioner been able to cross-examine Detective Jacklitsch at trial, Petitioner could have challenged the reliability of both the crime scene report and diagram by asking him about, *inter alia*, his training and qualifications; the specific steps he used to collect the ballistics evidence at the scene; whether any other person helped him collect and measure the location of the ballistics evidence; what equipment he or someone else used to measure the relative locations of the ballistics evidence; whether he moved any of the evidence before photographing or measuring it; how he knew whether the instruments he used were accurate at the time; what steps he took when translating his written field notes into typed reports; whether and how he made contemporaneous notes about the location of the ballistics or whether he relied on memory when he later prepared his report; whether he edited his photographs, which were included as thumbnails within the crime scene report; and whether he omitted any information from the crime scene report or diagram.  These are all fundamental questions that Detective Brown was unable to answer.  (*See* Trial Tr., at 84-88, 107 (Detective Brown admitting that he did not know what instrument Detective Jacklitsch used to take the measurements or the accuracy of that instrument, and that he did not know whether any of the evidence had been moved, or where each piece of evidence had been located before the photographs were taken).

Accordingly, under applicable Supreme Court precedent, this Court finds that Petitioner's Sixth Amendment right to confrontation was violated when Detective Jacklitsch's crime scene report and diagram (along with Detective Brown's duplicative diagram) were admitted into evidence at Petitioner's trial without his being afforded an opportunity for cross-examination.

> **b.    The Appellate Division's Decision**
> **Was Not Only Erroneous, But Also an**
> **"Unreasonable" Application of Federal Law.**

Under AEDPA, the court's inquiry does not end with the conclusion that the admission of the above-described ballistics evidence was erroneous. *See Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007). The relevant question for this Court is not whether the state court's determination was incorrect, but rather "whether that determination was unreasonable," which is "a substantially higher threshold." *Id.* at 473.

Here, in affirming Petitioner's conviction, the Appellate Division – just as it had in *Garlick* – explicitly rested its analysis as to whether the crime scene report and diagrams were "testimonial" on the reasoning of *People v. Freycinet*, 11 N.Y.3d 38 (2008) (*see supra*, n.12). In *Freycinet*, which was decided after *Crawford*, but before *Melendez-Diaz* and *Bullcoming*, the New York Court of Appeals held that statements that do not "directly link" the defendant to the crime are not testimonial. *Freycinet*, 11 N.Y.3d at 42 (finding report non-testimonial where it was "concerned only with what happened to the victim, not with who killed her"). Like in *Garlick*, the Appellate Division here relied on *Freycinet* to conclude that Petitioner's right of confrontation was not violated because the crime scene evidence "did not link the commission of the crime to a particular person." *See Diaz*, 151 A.D.3d at 503; *see also People v. Garlick*, 144 A.D.3d 605, 606 (1st Dep't 2016) (using the exact same reasoning and case authority to reject the appellant's Confrontation Clause claim).

This reasoning was in direct conflict with clearly established Supreme Court precedent. In *Melendez-Diaz*, a case decided nearly eight years before the Appellate Division's decision here, the Supreme Court definitively rejected the accusatory/non-accusatory distinction. *See Melendez Diaz*, 557 U.S. at 313-14. Indeed, Justice Scalia, writing for the majority in *Melendez Diaz*, made clear that the Constitution "contemplates two classes of witnesses – those against the defendant and those in his favor . . . there is not a third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." *Id*. Nonetheless, the Appellate Division's decision in this case, in identical fashion to *Garlick*, relied on the existence of just such a third category. Upon a review of the controlling Supreme Court law that was in existence at the time of Petitioner's direct appeal, no fair-minded jurist could have concluded that the Appellate Division's reasoning – or its decision, based on that reasoning – was justified under federal law. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). In other words, even if, as Respondent contended before the Appellate Division (*see* Resp. App. Br., at 24), the ballistics evidence at issue contained only a contemporaneous, "objective account[] of observable facts" that did not accuse Petitioner (or any other potential suspect), the purportedly "non-accusatory" nature of the documents could not have afforded the court a basis, under established federal law, for finding the statements therein non-testimonial. *See Melendez-Diaz*, 557 U.S. at 318-21; *Bullcoming*, 564 U.S. at 661-62; *Crawford*, 541 U.S. at 68-69.

For all of these reasons, this Court finds that the Appellate Division's rejection of Petitioner's federal Confrontation Clause claim was not only erroneous, but an unreasonable application of federal law, warranting habeas belief under Section 2254(d).

### 4.    The Trial Court's Error in This Case Was Not Harmless.

Contrary to Respondent's assertions (*see* Resp. Mem., at 16-18), the deprivation of

Petitioner's Confrontation Clause rights was not harmless, especially as (1) the medical examiner

could not determine what type of bullet killed Santiago, how far away the shooter was standing,

or from what direction the fatal shot had been fired (*see* Trial Tr., at 796-803, 806); and (2) the

various eyewitnesses gave inconsistent accounts as to who had been a shooter and did not

provide clarity on the types of guns the shooters had used (*see id.*, at 263, 290, 294-95, 511,

541).

As evidenced by the trial transcript, establishing – through ballistics evidence – the

location of the shooter who killed Santiago, and what kind of gun he fired, were critical to the

prosecution's case.  Yet this information appears to have come only from the crime scene report,

the diagrams, and the testimony of Detectives Brown and Fox, each of whom admittedly relied

on Detective Jacklitsch's findings.  The prosecution's theory was clear:  as Petitioner was

allegedly on the northeast corner of Willis Avenue and 146th Street at the time of the shootout,

and as, based on Detective Jacklitsch's crime scene report and diagram, bullet casings were

found at that corner, Petitioner was likely one of the shooters.  (*See id.*, at 948.)  Further, the

prosecution reasoned – again based on the diagram of the scene and where recovered ballistics

evidence was located on that diagram, that the fatal shot to Santiago would not logically have

come from the other shooters, in light of where they were purportedly positioned vis-à-vis

Santiago, and the directions in which each of the shooters would presumably have been aiming.

(*See id.*, at 947, 950, 991.)  Moreover, Detective Fox, the ballistics expert for the prosecution,

relied on Detective Jacklitsch's crime scene analysis to opine on which bullet fragments or

casings had come from which firearms.  (*See id.*, at 328-29, 336.)  This evidence was used by the

prosecution not only to tie Petitioner to a type of gun (a .45 caliber firearm, based on the type of

casings reportedly found at the corner), but also to the type of bullet – never identified by the

medical examiner – that most likely struck and killed Santiago (a .45 caliber bullet, based, again,

on ballistics evidence found at the scene, in Santiago's general vicinity).  In other words, the

prosecution's case against Petitioner was largely constructed from the information contained in

Detective Jacklitsch's crime scene report and diagram.

It is true, as Respondent points out (*see* Resp. Mem., at 16-17), that there were

eyewitness accounts of the shootout and that two witnesses identified Petitioner as having been

in possession of a gun at the scene.  That testimony, however, did not answer the question of

which bullet – of the many fired by more than one participant in the shootout – killed Santiago.

Notably, Jones testified that the person standing at the corner of Willis and 146th Street was

shooting a 9mm firearm (*see* Trial Tr., at 511, 541), but this evidence was contradicted by

Detective Jacklitsch's diagram and crime scene report, which suggested that someone at that

corner was shooting a .45 caliber gun.  Thus, Jones's testimony did not support the prosecution's

theory that Santiago had been killed by a .45 caliber bullet, and that someone on that corner had

fired the fatal shot.  (*See id*.)   In addition, the various witnesses gave inconsistent testimony on

a number of details, such as the clothing that the shooter was wearing (*compare id.*, at 515, 517,

526-27 (Jones testifying that the shooter was not wearing a hat) *with* 263, 290, 294-95 (Soto

testifying that the shooter was wearing a baseball cap); *compare also id*. at 263, 507-09, 535

(Jones and Soto testifying that the shooter was wearing a red shirt) *with id.*, at 643-54, 675-77

(Castro not identifying anyone at the scene as wearing red)).  Furthermore, while each of the

eyewitnesses testified that at least three shooters were involved in the shootout, no witness

testified to having seen the entire event.  It was the evidence supplied by Detective Jacklitsch that enabled the prosecution to fill in any evidentiary gaps in the eyewitnesses' testimony.

Finally, it should be emphasized that the prosecution made significant use of the ballistics evidence in summation, which again reflects how critical it perceived that evidence to be.  More particularly, acknowledging that witnesses "saw things differently" and that "no one [could] say" which bullet killed Santiago (*id.*, at 939-40), the prosecution leaned heavily on Detective Jacklitsch's work to try to persuade the jury of Petitioner's guilt.  In substance, the prosecution's argument was that, because a .45 caliber bullet fragment was found east of Santiago and because ballistics suggested that the two other shooters were shooting west using 9mm and .22-caliber firearms, someone from Irrizary's group (particularly, Petitioner), standing at Willis and 146th Street, must have fired a .45 caliber gun, and a bullet from that gun must have killed Santiago. (*See id.*, at 28-29, 947-50, 991.)

Ultimately, even if the jury believed Soto and Jones that Petitioner was present at the scene, it is apparent that Detective Jacklitsch's crime scene analysis served to link him to the fatal shot.  Because the Confrontation Clause required the trial court to allow Petitioner to probe Detective Jacklitsch's qualifications, methodology, and credibility, but Petitioner was not afforded such an opportunity, his rights were violated.  *See Bullcoming*, 564 U.S. 647; *Melendez-Diaz*, 558 U.S. 305.  The Appellate Division's affirmance of Petitioner's conviction was both erroneous and an unreasonable application of clearly established Supreme Court law, *see* 28 U.S.C. § 2254(d), and the error was not harmless.  Accordingly, I recommend Petitioner be afforded habeas relief.

## CONCLUSION

For all of the foregoing reasons, I respectfully recommend that Petitioner's Petition for a Writ of Habeas Corpus (Dkt. 1) be granted and that Respondent be directed to release Petitioner from custody unless the People of the State of New York decide to re-try him within the next ninety (90) days.  Given that this Court recommends that the Petition be granted, there is no need to issue a Certificate of Appealability for purposes of appeal.  If, however, the District Court does not adopt this Report and Recommendation and denies the Petition, I would further recommend that, because Petitioner has made a substantial showing of the denial of a constitutional right, a certificate of appealability issue on the questions of (1) whether the Supreme Court's Confrontation Clause precedent clearly established that the statements at issue were testimonial, and (2) if so, whether the Appellate Division's decision denying Petitioner's Confrontation Clause claim involved an unreasonable application of, that precedent.  *See* 28 U.S.C. § 2254(d).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, New York, New York 10007, Room 2210, if required by Judge Torres's Individual Practices.  Any requests for an extension of time for filing objections must be directed to Judge Torres.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.  *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension*

*Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d

Cir. 1992); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714

F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York
       April 14, 2022

                                 Respectfully submitted,

                                 _____
                                 DEBRA FREEMAN
                                 United States Magistrate Judge

Copies to:

All counsel (via ECF)